## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| FTX RECOVERY TRUST, | |
| Plaintiff, | |
| - against - | |
| HUOBI GLOBAL LTD., ABOUT CAPITAL MANAGEMENT (HK) CO., LTD., DIGITAL LEGEND HODLINGS LTD., HBIT LTD., ORANGE ANTHEM LTD., and POLO DIGITAL ASSETS, LTD., | Adv. Pro. No. 24-50219 (KBO) |
| Defendants. | |

## PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................................................ 1

JURISDICTION AND VENUE ............................................................................................... 2

RELEVANT BACKGROUND ................................................................................................ 2

APPLICABLE STANDARD .................................................................................................... 3

ARGUMENT ........................................................................................................................... 4

I.   Amendment Would Not Be Futile .................................................................................. 4

    A.   Amendment of the Trust's Claims Regarding Its Alter Ego Theory Is Not
        Futile Because the Amended Complaint Plausibly Alleges that Justin Sun
        Dominates and Controls Huobi, Poloniex, and Orange Anthem .................................. 4

    B.   The Amended Complaint Alleges Plausible Turnover and Automatic Stay
        Claims Independent of Alter-Ego Liability ................................................................ 12

    C.   Amendment to Include a Claim for Equitable Subordination Would Not Be
        Futile .......................................................................................................................... 15

II.  There Is No Unfair Prejudice to Defendants .................................................................. 17

III. There Is No Undue Delay .............................................................................................. 19

IV. There Is No Bad Faith or Dilatory Motive ..................................................................... 19

CONCLUSION ........................................................................................................................ 20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adams* v. *Gould Inc.*,
  739 F.2d 858 (3d Cir. 1984)...........................................................................3, 19

*Am. Bell Inc.* v. *Fed'n of Tel. Workers of Pa.*,
  736 F.2d 879 (3d Cir. 1984)....................................................................................5

*In re Am. Home Mortg. Holding*,
  458 B.R. 161 (Bankr. D. Del. 2011) .....................................................................12

*Barron* v. *Helbiz, Inc.*,
  2021 U.S. App. LEXIS 29745 (2d Cir. Oct. 4, 2021).............................................19

*Bd. of Trustees of Teamsters Local 863 Pension Fund* v. *Foodtown, Inc.*,
  296 F.3d 164 (3d Cir. 2002)....................................................................................7

*Blair* v. *Infineon Techs. AG*,
  720 F. Supp. 2d 462 (D. Del. 2010).........................................................................5

*In re Burlington Motor Carriers, Inc.*,
  1999 WL 1427683 (D. Del. Dec. 30, 1999)...........................................................19

*Ceja* v. *City of Beverly Hills*,
  2023 WL 8438544 (C.D. Cal. Dec. 1, 2023) .........................................................13

*City of Chicago* v. *Fulton*,
  592 U.S. 154 (2021)...............................................................................................13

*Clarke* v. *Fonix Corp.*,
  1999 WL 105031 (S.D.N.Y. Mar. 1, 1999) .............................................................4

*Coca-Cola Bottling Co. of Elizabethtown, Inc.* v. *Coca-Cola Co.*,
  668 F. Supp. 906 (D. Del. 1987)............................................................................19

*Compagnie des Grands Hotels d'Afrique S.A.* v. *Starwood Capital Grp. Global I
  LLC*,
  2019 WL 148454 (D. Del. Jan. 9, 2019).................................................................7

*Cornell & Co.* v. *Occupational Safety & Health Rev. Comm'n.*,
  573 F.2d 820 (3d Cir. 1978)..................................................................................19

*Custom Pak Brokerage, LLC* v. *Dandrea Produce, Inc.*,
  2014 U.S. Dist. LEXIS 31681 (D.N.J. Feb. 27, 2014) ............................................4

*In re Daya Meds., Inc.*,
    560 B.R. 855 (Bankr. S.D. Fla., 2016)...................................................................14

*In re Fleming Cos.*,
    323 B.R. 144 (Bankr. D. Del 2005) ...............................................................17, 18

*Hammond* v. *Lancaster City Bureau of Police*,
    799 F. App'x 158 (3d Cir. 2020) .....................................................................4

*Invensas Corp.* v. *Renesas Elecs. Corp.*,
    2013 WL 1776112 (D. Del. Apr. 24, 2013)........................................................18

*In re Johnson*,
    548 B.R. 770 (Bankr. S.D. Ohio, 2016).............................................................15

*In re Klarchek*,
    508 B.R. 386 (Bankr. N.D. Ill. 2014) ...............................................................14

*Long* v. *Wilson*,
    393 F.3d 390 (3d Cir. 2004)...........................................................................4

*Loosier* v. *Unknown Med. Dr.*,
    435 F. App'x 302 (5th Cir. 2010) ...................................................................13

*Loreley Financing (Jersey) No. 3. Ltd.* v. *Wells Fargo Securities, LLC*,
    797 F.3d 160 (2d Cir. 2015)...........................................................................20

*Lorenz* v. *CSX Corp.*,
    1 F.3d 1406 (3d Cir. 1993).............................................................................19

*In re Mid-Am. Waste Sys., Inc.*,
    284 B.R. 53 (Bankr. D. Del. 2002) ..................................................................17

*In re Mortg. Lenders Network, USA, Inc.*,
    395 B.R. 871 (Bankr. D. Del. 2008) .................................................................19

*Nespresso USA, Inc.* v. *Ethical Coffee Co. SA*,
    2017 WL 3021066 (D. Del. July 14, 2017) .........................................................4

*Perez* v. *MVNBC Corp.*,
    2016 WL 6996179 (S.D.N.Y. Nov. 29, 2016).......................................................4

*Pharm. Sales & Consulting Corp.* v. *J.W.S Delavau Co., Inc.*,
    106 F. Supp. 2d 761 (D.N.J. 2000)....................................................................4

*Pontiaki Special Mar. Enter.* v. *Taleveras Grp.*,
    2016 WL 4497058 (D. Del. Aug. 26, 2016) ........................................................6

*In re Prudential Lines, Inc.*,
 928 F.2d 565 (2d Cir. 1991) .................................................................................. 14

*Shane* v. *Fauver*,
 213 F.3d 113 (3d Cir. 2000) .................................................................................... 4

*In re The IT Grp.*,
 361 B.R. 417 (Bankr. D. Del. 2007) ........................................................... 4, 17, 19

*In re Thgh Liquidating LLC*,
 2020 WL 5409002 (D. Del. Sep. 9, 2020) ......................................................... 13, 14

*Trs. of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds* v. *Lutyk*,
 332 F.3d 188 (3d Cir. 2003) ..................................................................................... 5

*In re Woodbridge Grp. of Cos.*,
 2021 WL 5774217 (Bankr. D. Del. Dec. 6, 2021) ................................................. 18

*In re Zohar III, Corp.*,
 639 B.R. 73 (Bankr. D. Del. 2022) (Owens, J.), *aff'd*, 620 F. Supp. 3d 147 (D.
 Del. 2022) ............................................................................................................... 15

**Cases**

Federal Rule of Bankruptcy Procedure 7015 .......................................................... 1, 3

Federal Rule of Civil Procedure 15 ...................................................................... 1, 2, 3

Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable by Federal Rule of Bankruptcy Procedure 7015, Plaintiff FTX Recovery Trust ("Plaintiff" or the "Trust") respectfully moves (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), granting the Trust leave to file an amended complaint in the above-captioned adversary proceeding (the "Adversary Proceeding").  In support of this Motion, Plaintiff respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff commenced this Adversary Proceeding on November 9, 2024 against Huobi Global Ltd. ("Huobi Global"), About Capital Management (HK) Co. Ltd., ("About Capital"), Digital Legend Hodlings Ltd. ("Digital Legend"), Orange Anthem Ltd. ("Orange Anthem"), and Polo Digital Assets, Ltd. (together, the "Defendants"), seeking, *inter alia*, the turnover of estate assets, damages for violations of the automatic stay, and the disallowance of claims.  [Adv. D.I. 1] (the "Original Complaint").

2.      On April 21, 2025, Defendants About Capital, Digital Legend, and Orange Anthem moved to dismiss the Original Complaint for lack of personal jurisdiction and/or for failure to state a claim.  [Adv. D.I. 28, 30] (the "Motions to Dismiss").  On December 8, 2025, the Court granted the Motions to Dismiss with respect to Defendants About Capital, Digital Legend, and Orange Anthem without prejudice, and authorized Plaintiff to file a motion for leave to file an amended complaint.  [Adv. D.I. 61].  Plaintiff seeks leave to file an amended complaint (the "Amended Complaint") for the purpose of repleading its claims against About Capital, Digital Legend, and Orange Anthem, and to include additional claims and defendants.[2]

---

[2]      Capitalized terms not defined herein shall have the same meaning attributed to them in the Original Complaint.  The proposed Amended Complaint is attached hereto as **Exhibit B**.  A redline version showing the changes between the Original Complaint and the proposed Amended Complaint is attached hereto as **Exhibit C**.

3.      Since filing the Original Complaint, Plaintiff has conducted significant additional investigation and analysis, including review of extensive documentary evidence and third-party materials, which has uncovered further facts corroborating and supporting additional claims against the defendants in the Original Complaint, as well as additional defendants.  Consistent with this Court's December 8 ruling on the Motions to Dismiss, Plaintiff has prepared and now seeks leave to file an Amended Complaint that incorporates these additional claims and this further-developed factual record.  Plaintiff's proposed amendment is based on its ongoing investigation of the voluminous factual record underlying this proceeding, including facts not previously available, and is tailored to address the issues identified by the Court in its decision on the Motions to Dismiss.

4.      Because Rule 15(a)(2) of the Federal Rules directs that the Court should "freely give leave" to amend "when justice so requires," and because these additional facts establish a basis for repleading, the Court should grant Plaintiff's Motion.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Plaintiff consents to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELEVANT BACKGROUND

6.      Plaintiff commenced this Adversary Proceedings on November 9, 2024 against Huobi Global, About Capital, Digital Legend, Orange Anthem, and Polo Digital Assets Ltd..

[Adv. D.I. 1]. Through the Original Complaint, Plaintiff asserted claims (i) for the turnover of assets valued at approximately $27.5 million as of the Petition Date from the Huobi and Poloniex exchanges pursuant to Section 542; (ii) for violations of the automatic stay pursuant to Section 362 of the Bankruptcy Code for actions affecting property of the debtors' estates; and (iii) to disallow any and all claims filed or held by Defendants unless and until they have turned over Plaintiff's assets.

7.      On April 21, 2025, Defendants About Capital, Digital Legend, and Orange Anthem moved to dismiss the Original Complaint for lack of personal jurisdiction and/or for failure to state a claim. [Adv. D.I. 28, 30]. On December 8, 2025 the Court heard oral argument and entered an order granting the Motions to Dismiss for failure to state a claim. [Adv. D.I. 61]. The Court held that Plaintiff's Original Complaint did not adequately plead alter ego liability with respect to the Defendants, and that the Trust's automatic stay claim did not plead a violation beyond the "mere retention" of estate property. (Dec. 8, 2025 Hearing Tr. 52:4-53:9).

8.      This Motion is based primarily on the development of the factual record arising out of the Trust's ongoing investigation of matters underlying this Adversary Proceeding, including information not available at the time the Adversary Proceeding was initiated, and the Court's decision on the Motions to Dismiss.

## APPLICABLE STANDARD

9.      Under Rule 15(a)(2) of the Federal Rules, made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7015, the Court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); *see* Fed. R. Bankr. P. 7015. "[U]nder the liberal pleading philosophy of the [F]ederal [R]ules as incorporated in Rule 15(a), an amendment should be allowed whenever there has not been undue delay, bad faith on the part of the plaintiff, or prejudice to the defendant as a result of the delay," and amendment would not be futile. *Adams* v.

*Gould Inc.*, 739 F.2d 858, 867-68 (3d Cir. 1984); *Hammond* v. *Lancaster City Bureau of Police*, 799 F. App'x 158, 162 (3d Cir. 2020).[3]  The burden to establish undue delay, bad faith, prejudice, or futility is on the non-moving party.  *Long* v. *Wilson*, 393 F.3d 390, 400 (3d Cir. 2004); *Pharm. Sales & Consulting Corp.* v. *J.W.S Delavau Co., Inc.*, 106 F. Supp. 2d 761, 764 (D.N.J. 2000).

10.     As demonstrated herein, the proposed amendment would not be futile, does not prejudice the Defendants, and does not evince undue delay, bad faith, or a dilatory motive.

## ARGUMENT

### I.     Amendment Would Not Be Futile.

11.     Plaintiff's proposed amendment to its Original Complaint is not futile.  An amendment is futile "when the claim or defense is not accompanied by a showing of plausibility sufficient to present a triable issue."  *In re The IT Grp.*, 361 B.R. 417, 421 (Bankr. D. Del. 2007).  In other words, amending is futile when the amended complaint will not survive a motion to dismiss.  *Nespresso USA, Inc.* v. *Ethical Coffee Co. SA*, 2017 WL 3021066, at *2 (D. Del. July 14, 2017); *Shane* v. *Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).

> ### A.     Amendment of the Trust's Claims Regarding Its Alter Ego Theory Is Not Futile Because the Amended Complaint Plausibly Alleges that Justin Sun Dominates and Controls Huobi, Poloniex, and Orange Anthem.

12.     The Court directed Plaintiff at the December 8 hearing on the Motions to Dismiss, if seeking leave to replead, to "support[] by facts" in the complaint "the factors that support alter-

---

[3]     Plaintiff's proposed amendment seeks to include as additional defendants Huobi Global S.A. and Yuchen "Justin" Sun.  Federal Rule of Civil Procedure 21, made applicable by Federal Rule of Bankruptcy Procedure 7021, governs proposed amendments seeking to add new parties.  *See Perez* v. *MVNBC Corp.*, 2016 WL 6996179, at *3 (S.D.N.Y. Nov. 29, 2016).  In deciding whether to allow amendment to include new parties, the Court is guided by the same standard of liberality afforded to motions to amend pleadings under Rule 15.  *See Clarke* v. *Fonix Corp.*, 1999 WL 105031, at *6 (S.D.N.Y. Mar. 1, 1999), *aff'd* 199 F.3d 1321 (2d Cir.1999).  However, current parties "unaffected by the proposed amendment do not have standing to assert claims of futility on behalf of proposed defendants."  *Custom Pak Brokerage, LLC* v. *Dandrea Produce, Inc.*, 2014 U.S. Dist. LEXIS 31681, at *6-7 (D.N.J. Feb. 27, 2014) (cleaned up).

ego claims." (Dec. 8, 2025 Hearing Tr. 54:13-15). In its Amended Complaint, Plaintiff directly connects Huobi, Poloniex, and Orange Anthem with Justin Sun, thereby plausibly alleging that these entities operate as Sun's alter egos. *See* Am. Compl. ¶¶ 27-53.

13. In determining whether an entity operates as an alter ego, courts consider, *inter alia*, (i) whether the entities fail to observe corporate formalities, (ii) whether the entities are a mere façade through which an individual advances his personal interests, and (iii) whether the entities maintain non-functioning directors. *See, e.g.*, *Trs. of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds* v. *Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003). A defendant's use of the corporate form must present an overall element of injustice or unfairness, but "a number of [the alter-ego] factors can be sufficient to show such unfairness." *Id.* (quoting *United States* v. *Pisani*, 646 F.2d 83, 88 (3d Cir. 1981)); *see also Blair* v. *Infineon Techs. AG*, 720 F. Supp. 2d 462, 472-73 (D. Del. 2010). Plaintiff's proposed amendments, which are detailed below, provide factual support for a number of these factors and thus are not futile under Third Circuit precedent and this Court's corresponding directive. *See, e.g.*, *Lutyk*, 332 F.3d at 194 (emphasizing that the Third Circuit has "never characterized these 'factors' as elements of a rigid test"); *Am. Bell Inc.* v. *Fed'n of Tel. Workers of Pa.*, 736 F.2d 879, 886-87 (3d Cir. 1984) (highlighting that the alter-ego factors are "not the exclusive approach" and "there may be a less precise notion that the corporations simply acted interchangeably and in disregard of their corporate separateness" (internal quotation marks omitted).

### i. Sun's Entities Have Failed to Observe Corporate Formalities.

14. The Amended Complaint alleges that Sun's entities failed to observe even the most basic corporate formalities, and that the entities operated as mere façades for his business interests. In particular, Sun's enterprise is operated through "intentionally opaque and non-functional

corporate structures."  Am Compl. ¶ 28.  These intentionally opaque structures "allow[] for a reasonable inference" that Sun failed to observe corporate formalities.  *Pontiaki Special Mar. Enter.* v. *Taleveras Grp.*, 2016 WL 4497058, at *4 (D. Del. Aug. 26, 2016).  For example, the Amended Complaint alleges that:

- "[A] publicly available Huobi service agreement refers to 'HTX Ltd.' as a counterparty to certain Huobi agreements.  Although Huobi identifies HTX Ltd. as being incorporated in the Seychelles, the Trust has been unable to identify any company incorporated under that name in the Seychelles corporate registry."  Am. Compl. ¶ 28.

- "Other Huobi agreements do not even identify a single extant corporate entity, and instead refer generally to the 'HTX Platform.'  Huobi's primary user agreement highlights the absurdity and intentional opacity of this structure, stating that Huobi is operated by a group of 'HTX Operators' that includes 'all parties that run the Platform, including but not limited to legal persons, ***unincorporated organisations*** and teams that provide the Services and are responsible for such Services' (emphasis added).  The agreement notes that 'the HTX Operators may change as our business adjusts, in which case the changed operators shall perform their obligations under this Agreement and provide the Services to you,' and that '[i]n case of a dispute, you shall determine the entities by which this Agreement are performed with you and the counterparties of the dispute, depending on the specific Services that you use and the particular actions that affect your rights or interests.'" *Id.* (alteration in original).

- "Similarly, Poloniex's website identifies only one corporate entity, Defendant Polo Digital Assets, Ltd., on a page describing regulations in the European Economic Area, but all other areas of Poloniex's website, including the user agreement contained therein, are otherwise devoid of reference to any corporate entities. Notwithstanding that Poloniex's website identifies Defendant Polo Digital Assets, Ltd., the Seychelles corporate registry indicates that Polo Digital Assets, Ltd. has been dissolved and stricken off.  A former Poloniex employee observed that Poloniex's corporate structure was intentionally designed as 'a Russian nesting doll of obfuscation' for the express purpose of making it difficult for customers to sue." *Id.* ¶ 29.

15.    Sun's own conduct demonstrates that he treats Huobi and Poloniex not as independent corporate entities with separate management and governance, but as enterprises he personally owns, controls, and operates.  Courts have repeatedly held that when an individual publicly exercises operational control, announces policy decisions on an entity's behalf, and holds

himself out as the decisionmaker, such conduct evidences domination and a failure to respect corporate separateness.  *See Compagnie des Grands Hotels d'Afrique S.A.* v. *Starwood Capital Grp. Global I LLC*, 2019 WL 148454, at *4 (D. Del. Jan. 9, 2019) ("This failure to maintain formal barriers between management is enough to plead that Starman failed to observe corporate formalities."); *see also Bd. of Trustees of Teamsters Local 863 Pension Fund* v. *Foodtown, Inc.*, 296 F.3d 164, 172 (3d Cir. 2002).  The Amended Complaint alleges that Sun has repeatedly announced platform policies, financial decisions, and operational changes for Huobi and Poloniex in his personal capacity, including via public statements and social media, without reference to boards, officers, or independent corporate authorization.  Such conduct reflects a breakdown of formal governance barriers, the absence of meaningful separation between ownership and management, and use of corporate forms as instrumentalities rather than independent enterprises:

- "Sun is not merely an influential outsider or informal advisor to the Huobi and Poloniex exchanges; he is their acknowledged owner and ultimate controller. Public reporting confirms that Sun acquired controlling interests in Huobi and Poloniex through entities he owns and controls, and that he has since treated the exchanges as integral components of a unified business enterprise.  Public reporting also describes Sun as more than just an informal 'advisor' to Huobi; rather, Sun 'has effectively functioned as [Huobi]'s leader,' including by exercising day-to-day control and setting corporate strategy.  Similarly, comments by former Poloniex employees confirm that Sun entirely controls the policies and procedures of the Poloniex exchange after he acquired it in 2022.  Sun has reportedly slackened token listing requirements, 'bulldoz[ed] Poloniex's KYC rules,' and automated the exchange's KYC system to 'virtually rubber-stamp[] government IDs of any kind.'"  Am. Compl. ¶ 30.

- "Sun has repeatedly referred to Huobi and Poloniex as 'his' exchanges and their assets as 'his' money.  As just one example, in November 2022, in response to concerns about Huobi's solvency in the wake of the FTX collapse, Sun sought to allay any worries by posting a message on X (formerly Twitter) that '***Brother Sun will cherish the Huobi brand like his own child (after all, it cost over a billion dollars, needs to keep making money, and tarnishing [its] reputation would be a huge loss).***'  Sun continued by assuring Huobi customers that Huobi had adequate reserves and that there was no need for customers to withdraw their assets, stating '***Some people say they want to withdraw coins to drain Brother Sun's money,***

*Brother Sun doesn't want that, but he's absolutely not afraid of everyone withdrawing coins.*' *Id.* ¶ 31 (emphasis in original).

- "Other public comments from Sun further underscore his control and ownership over Huobi, including by announcing what tokens may be listed on the Huobi exchange" and "by discussing reports regarding Sun's efforts to solicit potential buyers for Huobi." *Id.* ¶ 32.

- "Immediately following [separate November 2023 security incidents affecting Huobi and Poloniex], Sun issued public statements addressing users of Huobi and Poloniex collectively. In those statements, Sun announced that *both* platforms were suspending deposits and withdrawals and represented that 'we' would bear the losses arising from *all* of the security incidents across *both* exchanges. Sun did not distinguish between Huobi and Poloniex, attribute responsibility to separate management teams, or suggest that the platforms were independently operated or financially isolated from one another." *Id.* ¶ 36.

16.     Sun has failed to observe basic corporate formalities including with respect to the opening of Defendant Orange Anthem's FTX.com customer account. As alleged in the Amended Complaint, when opening the Orange Anthem FTX Account, Tron personnel operating at Sun's direction provided source of wealth documentation referencing assets held in the name of "Black Anthem Ltd.", another shell company where Sun was the sole shareholder and director. Am. Compl. ¶¶ 44, 90. When FTX personnel raised questions about this discrepancy, "the Tron personnel opening the Orange Anthem account expressly dismissed any distinction among the entities," and "stated 'Yes Sun Yuchen is the sole director for Black Anthem Ltd as same as Orange Anthem Ltd,' insisting that Sun's common ownership and control rendered the entities interchangeable." *Id.* "Thus, in the course of opening the Orange Anthem FTX Account, these Tron personnel operating at Sun's direction argued that FTX should ignore any distinctions between these ostensibly different legal entities and should instead recognize the situation for what it was: all of the accounts and assets held by Black Anthem and Orange Anthem were functionally interchangeable and were all owned and controlled by Sun." *Id.* ¶ 45.

17.     Moreover, the Amended Complaint alleges that various U.S. and foreign governmental and regulatory entities have observed that Sun and his web of entities routinely fail to observe corporate formalities.  This reoccurring pattern gives rise to the inference that Sun employs a pattern of inadequate recordkeeping, opaque governance, and disregard for corporate boundaries in operating his businesses:

- "In March 2023, the U.S. Securities and Exchange Commission filed a civil enforcement action alleging that Sun exercised pervasive control over multiple corporate entities—including Tron Foundation Limited, BitTorrent Foundation Ltd., and Rainberry, Inc.—such that those entities functioned as alter egos of Sun himself, rather than as independent actors. . . . The SEC alleged that Sun directed the entities' operations, orchestrated their transactions, and used them interchangeably to effectuate securities offerings, market manipulation, and deceptive practices, thereby abusing the corporate form to shield personal conduct and evade regulatory scrutiny." *Id.* ¶ 37.

- "Similarly, in August 2021, after Sun had acquired Poloniex, the SEC instituted a settled enforcement action against Poloniex, LLC, finding that it had operated the Poloniex exchange in the United States as an unregistered national securities exchange and failed to comply with basic regulatory obligations." *Id.* ¶ 37.

### ii.     Sun Uses His Entities as Mere Façades to Advance Personal Interests.

18.     The Amended Complaint alleges that Sun abuses his personal control over Orange Anthem, Huobi and Poloniex to advance his own business interests.  *See* Am. Compl. ¶ 38.  In particular, the Amended Complaint pleads:

- "In September 2022, in the weeks before Sun surreptitiously assumed control of Huobi through Defendants About Capital and Digital Legend, internal Huobi sources raised concerns that Sun would exploit the exchange for his personal gain. These concerns were relayed directly to FTX personnel while the Sun-Huobi deal was still being negotiated.  Huobi sources communicated to Samuel Bankman-Fried that Huobi's then-Chief Executive Officer, Li Lin, was hesitant to sell Huobi to Sun because he 'does not trust Justin Sun' and thought that 'Justin [would] arbitrage [Huobi] tokens to ruin the [H]uobi platform.'" *Id.* ¶ 39.

- "Poloniex employees have also reported that Sun exploited his control over the Poloniex exchange to advance his personal interests.  After Sun acquired and assumed control over the Poloniex exchange in October of 2019, a former employee recounted that Sun 'started to see all the possibilities of using Polo as more or less

his personal bank.'  As one example, employees described how Sun ordered Poloniex engineers to gather undelivered Bitcoin 'dust' on the Poloniex exchange—customer deposits suspended in limbo after customers accidentally deposited their Bitcoins into the wrong type of cryptocurrency wallet.  As the engineers worked to gather the Bitcoin at Sun's direction, they came to 'underst[and] that Justin Sun would take the Bitcoin personally.'  Pursuant to this project, which was officially titled 'Operation Couch Cushions,' 'nearly all the Bitcoin dust was siphoned out' of Poloniex, representing over $10 million in value and hundreds of customer transactions."  *Id.* ¶ 40.

- "As recently as December of 2025, public analyses of Huobi's proof-of-reserves demonstrate that Bitcoin products directly traceable to Sun's Poloniex make up a massive portion of Huobi's reserves—but Poloniex itself has yet to complete a proof-of-reserves, and Poloniex does not anywhere disclose where the Bitcoin backing its product is held, or where this Bitcoin comes from.  Public reports suggest that these connections 'raise worrying implications about how Sun uses [the reserves], and about [Huobi's] internal controls.'"  *Id.* ¶ 41.

- "Sun continues to exploit the fiction of corporate separateness between himself and Orange Anthem for his own personal benefit in these Chapter 11 Cases. Although the proof of claim associated with the Orange Anthem FTX Account was nominally filed in the name of Orange Anthem by (Tron personnel), Sun has publicly described himself—personally—as an FTX.com creditor." Am. Compl. ¶ 46.  "The Trust has, to date, identified no claims other than the Orange Anthem claim that are held in the name of Sun or otherwise directly linked to his various entities."  *Id.* ¶ 47.

### iii.    Sun's Entities Maintain Non-Functioning and Overlapping Directors.

19.    "Although much of the information regarding the functioning of the directors exists in the exclusive control of the Defendants, publicly available information indicates that Sun installs non-functioning directors with close personal relationships to him to oversee his entities."  Am. Compl. ¶ 48.  As alleged in the Amended Complaint:

- "Sun has installed Yiying Jiang—publicly reported to be Sun's stepmother—as a (or the sole) director of numerous entities he controls, including Defendant Digital Legend.  Jiang has served as director or shareholder of more than fifteen of Sun's other entities, including several entities directly connected to other defendants in this action.  As just one example, Jiang was the sole member of Augustech, LLC, a Delaware company that provided technology and IT services to Poloniex.  Public reporting notes that Augustech, LLC was the company Sun used to employ the U.S.-based personnel that operated the Poloniex exchange.  Indeed, Jiang's

signature appears on a filing with the Delaware Secretary of State seeking to dissolve Augustech, LLC, submitted in February 2025 (*i.e.*, shortly after the commencement of this Adversary Proceeding in November 2024)." *Id.* ¶ 49.

- "Jiang also is a director of several TRON Network entities—for example, she is a director of the Singapore entity 'Tron Foundation Limited,' and was appointed to that position the same day Sun resigned from his role as director of that entity, and also is the sole director of 'Tron Network Ltd.,' a British Virgin Islands entity. Jiang also serves as a director of Rainberry, Inc., a California company where Sun is the sole shareholder and Sun's father, Weike Sun, serves as CEO. Jiang's role at more than fifteen of Sun's entities, in connection with her close personal relationship to Sun, suggests that Jiang acts as a director in name only, with little actual function." *Id.* ¶ 50.

- "Sun's father, Weike Sun, also serves as the Chairman of the Board of Directors of 'Tron, Inc.' (Nasdaq: TRON), a publicly traded Nevada company that spent 25 years as a manufacturer of plush toys and other amusement park souvenirs operating under the name 'SRM Entertainment, Inc.' before announcing in mid-2025 a 'pivot' to a 'TRON Token Treasury Strategy.' As part of that 'pivot,' an entity nominally 100% owned by Weike Sun invested $100 million in the company, the existing Board was replaced by Weike Sun as Chairman and two other Tron-affiliated individuals, Justin Sun was named as 'Global Advisor,' and the company changed its name to Tron, Inc. Notwithstanding his lack of an official corporate title, Sun was front and center to ring the opening bell to celebrate Tron, Inc.'s rebranding," and "Tron, Inc. just last week announced another '$18 million strategic equity investment from Justin Sun, founder of the TRON blockchain,' through Sun's vehicle Black Anthem Limited." *Id.* ¶¶ 51-52.

### iv.   Sun's Abuse of the Corporate Form Presents Overall Elements of Fraud, Injustice and Unfairness.

20.    The Amended Complaint alleges that Sun's entities fail to observe corporate formalities and do not maintain adequate corporate records, operating without meaningful governance or compliance controls. "This absence of formal guardrails has facilitated, or at least failed to prevent, criminal activity on Sun's platforms." Am. Compl. ¶ 53. Indeed, *The Wall Street Journal* has "cited research that suggests that 'more than half of all illegal crypto activity—some $26 billion—took place on [TRON].'" *Id.* ¶ 53. Similarly, "Huobi has been used by scammers to deprive customers of billions of dollars of cryptocurrencies. In recent lawsuits, the Supreme Court of Seychelles found that Huobi Global Limited, then operating the Huobi exchange, had failed to

comply with its due-diligence obligations under the Anti-Money Laundering Act, thereby allowing individuals to improperly receive and store stolen assets on Huobi." *Id.* ¶ 54.  Moreover, as alleged in the Amended Complaint, Sun has deliberately maintained and exploited the opaque and shifting corporate structures of his entities to impede efforts to recover assets that rightfully belong to the Trust.  *See Id.* ¶ 55.  By failing to observe corporate formalities, obscuring ownership and control, and operating through a web of nominally separate entities that all function as his alter egos, Sun has made it extraordinarily (and intentionally) difficult to identify the proper entity against which to enforce the Trust's rights.  At the same time, Sun seeks to invoke those same corporate forms opportunistically by appearing in these proceedings as a creditor through yet another affiliated entity.  This asymmetric use of corporate formalities—to frustrate recovery on the one hand while asserting creditor rights on the other—works a manifest injustice.

*   *   *

21.    The above allegations raise the plausible inference that Defendants Huobi, Poloniex, and Orange Anthem are Sun's alter egos and exist solely as legal fictions.  Accordingly, amendment on this issue would not be futile, and this Court should therefore grant leave to amend.

**B.    The Amended Complaint Alleges Plausible Turnover and Automatic Stay Claims Independent of Alter-Ego Liability.**

22.    The Amended Complaint alleges that Huobi Global S.A., About Capital, and Digital Legend collectively operate the Huobi exchange.  Am. Compl. ¶ 26.  Those allegations must be accepted as true at this stage, with all inferences drawn in the light most favorable to the Trust.  A claim for turnover under Section 542 of the Bankruptcy Code "requires an entity in possession of property of the estate to deliver the property, or value thereof," to the estate.  *In re Am. Home Mortg. Holding*, 458 B.R. 161, 169 (Bankr. D. Del. 2011).  Because the Amended Complaint alleges that Huobi—the cryptocurrency exchange operated by About Capital, Digital

Legend, and Huobi Global S.A.—possesses estate property, the Defendants may not dispute at this stage that they are in possession of assets subject to turnover.  That remains true regardless of whether, following discovery, only one entity ultimately is determined to be in possession of the Alameda Assets.  *See Ceja* v. *City of Beverly Hills*, 2023 WL 8438544, at \*4 (C.D. Cal. Dec. 1, 2023) ("[I]t is well settled that a plaintiff . . . may allege that different defendants engaged in the same alleged conduct and use discovery to determine which defendant is actually liable."); *see Loosier* v. *Unknown Med. Dr.*, 435 F. App'x 302, 307 (5th Cir. 2010) (no requirement to plead facts exclusively known by defendants).  Accordingly, Plaintiff's well-pled turnover claim against About Capital, Digital Legend, and Huobi Global, S.A. can proceed even if Plaintiff's alter ego theory does not prevail, and amendment therefore would not be futile.

23.    A violation of the automatic stay pursuant to 11 U.S.C. § 362(a)(3) requires allegations that a defendant has engaged in affirmative acts that altered "the status quo of estate property as of the time when the bankruptcy petition was filed."  *City of Chicago* v. *Fulton*, 592 U.S. 154, 158 (2021); *see In re Thgh Liquidating LLC*, 2020 WL 5409002, at \*4 (D. Del. Sep. 9, 2020).  The Amended Complaint alleges affirmative acts that have altered the status quo of estate property.

24.    Prior to the Petition Date, the Debtors were "able to freely access the Alameda Accounts pre-petition and withdraw, trade or otherwise manage their assets held therein."  Am. Compl. ¶ 72. Even after the Petition Date, "the Debtors continued to have access to the Alameda Poloniex Account for a brief period of time, and were able to withdraw a portion of their assets" until "in the midst of that process—and notwithstanding the worldwide automatic stay that had taken effect as of the commencement of these Chapter 11 cases—Poloniex unilaterally disabled the Debtors' ability to make further withdrawals, effectively freezing the remaining assets in the

-13-

Alameda Poloniex Account." *Id.* ¶ 65. Poloniex's post-petition affirmative actions "altered the status quo ante by affirmatively disabling access to those accounts in response to the FTX Group's collapse," *Id.* ¶ 72, which is emphatically a disruption of the status quo ante and a violation of the automatic stay. *See In re Thgh Liquidating LLC*, 2020 WL 5409002, at *4.

25.     Huobi has further altered the status quo by devaluing the Trust's assets through other actions after the commencement of these Chapter 11 Cases. Prior to the Petition Date, the Debtors held several hundred thousand dollars' worth of Huobi Token ("HT") in the Alameda Huobi Account. *Id.* ¶ 73. However, in January 2024, "Huobi implemented a conversion scheme," available for only a limited period of time, "that stripped [HT] holders of virtually all economic and utility benefits tied to HT, and transferred those benefits to a newly created 'HTX' token." *Id.* "Because under the announced conversion process all functionalities and perks previously associated with HT were migrated to the HTX token, the price of HT precipitously declined—a ***more than 98% decline*** since the Petition Date—and HT holders that were able to access their Huobi accounts were effectively compelled to exchange their assets to preserve value." *Id.* Huobi's actions to withhold estate property while simultaneously taking steps to devalue it is a clear violation of the automatic stay. It is well established that Section 362(a)(3) encompasses any attempt to exercise control over the estate, including actions that threaten to adversely impact estate property. *In re Prudential Lines, Inc.*, 928 F.2d 565, 573-74 (2d Cir. 1991) (violation of the automatic stay to take a "worthless stock deduction" that "would have the legal effect of diminishing or eliminating property of the bankrupt estate."); *see also In re Klarchek*, 508 B.R. 386, 397 (Bankr. N.D. Ill. 2014) (finding that "given the potential adverse impact on property of the estate of the action, [the commencement of Dissolution Proceedings implicating estate property] must be stayed pursuant to section 362(a)(3)."); *In re Daya Meds., Inc.*, 560 B.R. 855,

858 (Bankr. S.D. Fla., 2016) ("Even where an action does not directly affect property of the estate, it is prohibited by the automatic stay if it has an adverse impact on property of the estate."); *In re Johnson*, 548 B.R. 770, 790 (Bankr. S.D. Ohio, 2016) ("[I]t is well recognized that actions against nondebtors that would have an 'adverse impact' upon the property of the estate are subject to the automatic stay under § 362(a)(3)").

26.     As the Court noted in its December 8 decision on the Motions to Dismiss, a "mere retention of estate property following the petition date" is insufficient to plausibly plead a violation of the automatic stay.  (Dec. 8, 2025 Hearing Tr. at 53:4-9).  Here, however, Plaintiff's Amended Complaint adequately pleads that Huobi and Poloniex have intentionally disrupted the *status quo ante*, and their actions far exceed the "mere retention" of estate assets.  Accordingly, Plaintiff's amendment to its claim for a violation of the automatic stay would not be futile.

## C.     Amendment to Include a Claim for Equitable Subordination Would Not Be Futile.

27.     A plaintiff states a claim for equitable subordination if (1) the defendant "engaged in some type of inequitable conduct," (2) the defendant's misconduct "resulted in injury to the creditors of the bankrupt or conferred an unfair advantage" on the defendant, and (3) equitable subordination would "not be inconsistent with the provisions of the Bankruptcy Code."  *In re Zohar III, Corp.*, 639 B.R. 73, 90 (Bankr. D. Del. 2022) (Owens, J.) (citation modified), *aff'd*, 620 F. Supp. 3d 147 (D. Del. 2022).

28.     The Amended Complaint adequately alleges that Sun and Orange Anthem engaged in inequitable conduct warranting subordination because there is "[e]vidence of more egregious conduct such as fraud, spoilation or overreaching." *In re Zohar III*, 639 B.R. at 91.  The Amended Complaint alleges that Sun, through Orange Anthem, sought to "exploit the Debtors' financial distress shortly before" their bankruptcy. Am. Compl. ¶ 75.  By November 9, 2022, "it was widely

understood by market participants, counterparties, and senior FTX Group management that the FTX Group was insolvent and that a bankruptcy filing was imminent" absent intervention.  *Id.* Rather than dealing at arm's length, Sun "sought to capitalize on the FTX Group's precarious financial condition" by negotiating a bespoke arrangement "focused exclusively on Sun-affiliated digital assets," including TRX, HT, SUN, JST, and BTT—tokens that Sun created, promoted, or controlled.  *Id.*

29.    The Amended Complaint alleges that this "liquidity facility" was expressly designed to permit withdrawals only for holders of Sun-related tokens at a moment when withdrawals were otherwise frozen for virtually all customers.  On November 10, 2022, Bankman-Fried announced that FTX.com had reached an agreement with Tron Network Limited to "establish a special facility to allow holders of TRX, BTT, JST, SUN, and HT to swap assets from FTX.com 1:1 to external wallets."  Am. Compl. ¶ 75.  Sun immediately publicized and amplified this arrangement, announcing that he would provide liquidity to holders of "his tokens" and that trading had resumed on FTX.com for TRX, JST, SUN, HT, and BTT.  *Id.* ¶ 77.

30.    The Amended Complaint further alleges that Sun's conduct was not merely opportunistic, but deliberately self-interested, manipulative, and fraudulent.  Upon information and belief, Sun's "publicized 'rescue' scheme was not intended to benefit FTX.com creditors."  *Id.* ¶ 81.  Rather, it "was designed to—and did—artificially inflate the prices of Sun-affiliated tokens by inducing a surge in demand on FTX.com, as creditors were forced to purchase those tokens as the sole apparent pathway to withdraw trapped assets."  *Id.*  Using an insolvent exchange as a captive market to drive demand for self-issued tokens, while extracting value from the estate on the eve of bankruptcy, constitutes precisely the kind of fraud and overreaching Section 510 recognizes as inequitable conduct.

31.     Inequitable conduct warrants subordination where, as here, "the claimant's inequitable conduct either (i) created some unfair advantage for the claimant or (ii) harmed the debtor or its creditors." *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 71 (Bankr. D. Del. 2002). The effect of the arrangement was to confer a singular and unfair advantage on Sun and Orange Anthem at the expense of the estate and its creditors. Although withdrawals were otherwise halted, Sun and Orange Anthem positioned themselves as the sole provider of liquidity capable of unlocking withdrawals. Accordingly, Sun "derived an unfair advantage by positioning [himself] as the gatekeeper[] of the only viable withdrawal path." Am. Compl. ¶ 80. That unfair advantage directly translated into harm to the Debtors and their creditors. Customers who did not already hold Sun-affiliated tokens were forced to convert other assets into TRX or related tokens "at substantial premiums in order to access the withdrawal corridor," thereby "reducing the amount of their holdings shortly before the Petition Date." *Id.* ¶¶ 78–79. At the same time, by "enabling asset withdrawals that otherwise would have remained property of the estate," Sun and Orange Anthem "directly reduced the pool of assets available for pro rata distribution among creditors." *Id.* ¶ 80. The arrangement thus reallocated value away from the estate and toward Sun-controlled entities at the precise moment when creditor equality was most critical.

## II.     There Is No Unfair Prejudice to Defendants.

32.     The proposed amendment would not unfairly prejudice Defendants. To show unfair prejudice, the nonmoving party must demonstrate it was "unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered if the amendment was timely." *In re The IT Grp.*, 361 B.R. at 421 (internal quotation marks and citation omitted). The prejudice must be "significant" in that it is "substantial or undue." *In re Fleming Cos.*, 323 B.R. 144, 148 (Bankr. D. Del 2005) (internal citations omitted). "[I]nconvenience to a party or the strengthening of the movant's legal position does not provide sufficient prejudice."

*Id.* Moreover, the fact that the amendments might require the defendant to conduct further discovery does not establish unfair prejudice when "the facts and circumstances relating to the proposed amendments are closely intertwined with the allegations set forth in the original complaint." *Id.* at 148-49. In short, the "mere allegation of prejudice and the possibility that some additional discovery will be required are insufficient to show prejudice." *In re Woodbridge Grp. of Cos.*, 2021 WL 5774217, at *6 (Bankr. D. Del. Dec. 6, 2021) (internal quotation marks omitted).

33.     Here, the proposed amendments do not deprive the Defendants of the opportunity to present evidence, and fact discovery has not yet commenced. *See Invensas Corp.* v. *Renesas Elecs. Corp.*, 2013 WL 1776112, at *3 (D. Del. Apr. 24, 2013) (no prejudice to defendant because the "discovery period in the case [was] still ongoing, . . . no trial date [was] currently scheduled, . . . no depositions had taken place, . . . and fact discovery [had] recently been extended"). Because fact discovery has not commenced, the parties have not yet engaged in expert discovery or summary judgment briefing.

34.     Moreover, the Amended Complaint creates no undue burden on the Defendants; the new allegations in the Amended Complaint—based on investigation and developments after the Original Complaint was filed—focus on the same issues and accounts addressed in the Original Complaint. *In re Woodbridge*, 2021 WL 5774217, at *7 (no prejudice where defendant's "rights and defenses against the [amended] claims remain fully available"). The Defendants have been on notice since the filing of the Original Complaint of Plaintiff's claims to the assets on the Huobi and Poloniex exchanges, and the challenges to any entitlement to the Orange Anthem Claim. Considering the procedural posture of this case and the substance of the amendments, the Defendants cannot establish "significant" or "substantial" prejudice.

**III.    There Is No Undue Delay.**

35.    Plaintiff did not act with any undue delay in filing this Motion.  The passage of time alone is an insufficient basis upon which to deny leave to amend.  *Cornell & Co.* v. *Occupational Safety & Health Rev. Comm'n*., 573 F.2d 820, 823 (3d Cir. 1978).  Instead, the court must consider whether the delay has become "undue" such that there is "an unwarranted burden on the court" or "prejudicial" such that there is "an unfair burden on the opposing party."  *Adams*, 739 F.2d at 868.  Plaintiff filed this Motion within the 30-day period that the Court permitted in its order granting the Defendants' Motions to Dismiss.  [Adv. D.I. 61].  A single month is a far cry from undue delay.  *Cf. In re The IT Grp., Inc.*, 361 B.R. at 420 ("[T]he Court does not agree that a delay of less than six months is 'undue'"); *In re Burlington Motor Carriers, Inc.*, 1999 WL 1427683, at *9 (D. Del. Dec. 30, 1999) (delay of ten months after complaint was filed did not constitute undue delay); *Coca-Cola Bottling Co. of Elizabethtown, Inc.* v. *Coca-Cola Co.*, 668 F. Supp. 906, 922 (D. Del. 1987) (delay of six and a half years after complaint was filed did not constitute undue delay); *see also Lorenz* v. *CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993) (undue delay where amendment was sought three years after original complaint and two years after second amended complaint, and plaintiff knew facts on which proposed amendment was based at time of original complaint).

**IV.    There Is No Bad Faith or Dilatory Motive.**

36.    Plaintiff also did not act with any bad faith or dilatory motive.  "[I]n assessing bad faith, courts look to the reasons why a party did not seek to amend earlier."  *In re Mortg. Lenders Network, USA, Inc.*, 395 B.R. 871, 879 (Bankr. D. Del. 2008).  As previously noted, Plaintiffs did not have the benefit of their continued investigation when the Original Complaint was filed.  Moreover, this Adversary Proceeding remained pending from April 2025 until December 2025 pending the Court's decision on the Defendants' Motions to Dismiss following the stay of discovery in June 2025.  [Adv. D.I. 45]; *see Barron* v. *Helbiz, Inc.*, 2021 U.S. App. LEXIS 29745,

at *9 (2d Cir. Oct. 4, 2021); *Loreley Financing (Jersey) No. 3. Ltd.* v. *Wells Fargo Securities, LLC*, 797 F.3d 160, 191 (2d Cir. 2015). Once the Motions to Dismiss were decided, Plaintiff acted promptly to seek leave to file the Amended Complaint.

## **CONCLUSION**

37.     For all of the foregoing reasons, the Court should grant the Motion. Plaintiff respectfully requests that the Court enter the attached proposed order and grant Plaintiff leave to file the Amended Complaint.

Dated: January 7, 2026
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Howard W. Robertson, IV*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson, IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      cobb@lrclaw.com
      mcguire@lrclaw.com
      robertson@lrclaw.com
-and-

**SULLIVAN & CROMWELL LLP**
Brian D. Glueckstein (admitted *pro hac vice*)
Justin J. DeCamp (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
Daniel P. O'Hara (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: gluecksteinb@sullcrom.com
      decampj@sullcrom.com
      dunnec@sullcrom.com
      crokej@sullcrom.com
      oharad@sullcrom.com

*Counsel for the FTX Recovery Trust*