# EXHIBIT A

```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                          .  Chapter 11
                                     .  Case No. 22-11068 (KBO)
 4   FTX TRADING LTD., et al.,       .
                                     .  (Jointly Administered)
 5             Debtors.             .
                                     .
 6   . . . . . . . . . . . . . . . . .
                                     .
 7   FTX RECOVERY TRUST,             .  Adversary Proceeding
                                     .  No. 24-50219 (KBO)
 8             Plaintiff,            .
                                     .
 9      -against-                    .
                                     .
10   HUOBI GLOBAL LTD., HTX LTD.,    .
     ABOUT CAPITAL MANAGEMENT (HK)   .
11   CO., LTD., DIGITAL LEGEND       .
     HODLINGS LTD., HBIT LTD.,       .
12   ORANGE ANTHEM LTD., and POLO    .  Courtroom No. 3
     DIGITAL ASSETS, LTD.,           .  844 King Street
13                                   .  Wilmington, Delaware 19801
              Defendants.            .
14                                   .  Monday, December 8, 2025
     . . . . . . . . . . . . . . . . .  9:31 a.m.
15

16                     TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE KAREN B. OWENS
17             CHIEF UNITED STATES BANKRUPTCY JUDGE

18


19


20   Audio Operator:        Jadon Culp, ECRO

21   Transcription Company:  Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1 | <u>APPEARANCES</u>:

2 | For the FTX
Recovery Trust:          Jacob M. Croke, Esquire
3 |                          SULLIVAN & CROMWELL, LLP
                           125 Broad Street
4 |                          New York, New York 10004

5 | For Digital Legend:      Gregory Strong, Esquire
                           CAHILL GORDON & REINDEL, LLP
6 |                          221 West 10th Street
                           3rd Floor
7 |                          Wilmington, Delaware 19801

8 | For About Capital
Management and
9 | Orange Anthem:           David Kirk, Esquire
                           KIRK & INGRAM, LLP
10 |                         43 West 43rd Street
                           Suite 279
11 |                         New York, New York 10036

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1                                  INDEX

2    MOTIONS:                                                      PAGE

3    Agenda
     Item 1:    Motion of Defendants About Capital Management         4
4               (HK) Co., Ltd. and Orange Anthem Ltd. to
                Dismiss the Complaint for Lack of Personal
5               Jurisdiction and Failure to State a Claim
                [FTX Recovery Trust v. Huobi Global Ltd., et
6               al., Adv. No. 24-50219 -Adv. D.I. 28, filed
                on April 21, 2025]

7
                Court's Ruling:                                      51
8
     Agenda
9    Item 2:    Digital Legend Hodlings Ltd.'s Motion to             4
                Dismiss the Complaint
10              [FTX Recovery Trust v. Huobi Global Ltd., et
                al., Adv. No. 24-50219 - Adv. D.I. 30, filed
11              on April 21, 2025]

12              Court's Ruling:                                      51

13

14

15   Transcriptionist's Certificate                                 56

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commenced at 9:31 a.m.)

2                THE CLERK:  All rise.

3                THE COURT:  Good morning, everyone.  Nice to see

4    you all.  Please be seated.

5                Okay.  So we're here on oral argument on the

6    motions to dismiss and I'm happy to defer to you all on how

7    you wish to proceed in your presentations.

8                MR. KIRK:  Good morning, Your Honor.

9                THE COURT:  Good morning.

10               MR. KIRK:  David Kirk with Kirk & Ingram.  I

11   represent Defendants About Capital Management and Orange

12   Anthem Ltd. and I'll begin the argument.

13               THE COURT:  Great.  Nice to meet you.

14               MR. KIRK:  So, Your Honor, I'd like to start with

15   a little framing to put the legal arguments on this motion in

16   perspective.  The dispute we have here involves counterparty

17   relationships between a number of different entities, all of

18   which are based in foreign countries, including the Debtors.

19   We have Orange Anthem, which had an account with millions of

20   dollars on the FTX Exchange.  Orange Anthem is a creditor of

21   the estate and has been waiting years to recover its assets.

22   Then we have About Capital.  Plaintiffs allege that in

23   September of 2022, About Capital and Digital Legend purchased

24   an ownership interest in Huobi Global and other entities that

25   operated the Huobi Cryptocurrency Exchange that was just two

1  months before the Debtors filed for bankruptcy.

2            The Plaintiffs allege that the Huobi Exchanged had

3  a counterparty relationship with Alameda Research, one of the

4  Debtors.  Plaintiffs are seeking a return of assets that

5  Alameda kept on the Huobi Exchange.  And, finally, Plaintiffs

6  are seeking the return of other assets that Alameda had on

7  the Poloniex Exchange.

8            So the estate is looking to retrieve Alameda's

9  assets from Poloniex and Huobi, but they're going about that

10 by trying to prevent an FTX creditor, Orange Anthem, from

11 getting its assets back from the estate.  Plaintiffs don't

12 allege that Orange Anthem had anything to do, other than file

13 a claim to recover its assets.  And Plaintiffs also don't

14 allege that About Capital did anything other than purchase

15 Huobi shortly before the FTX bankruptcy.  The only alleged

16 connection between these entities is that according to

17 Plaintiff, an individual named Justin Sun either has an

18 ownership interest in them or controls them.

19           So the question that we're going to be addressing

20 today is, can the Plaintiffs collapse these entities together

21 both, for jurisdictional purposes and for its substantive

22 claims by calling them alter-egos, because they're alleged to

23 have an owner in common?  And we think the answer is a clear

24 "no."  There's no legal or factual justification for that

25 extraordinary step.  So that means for this case, Plaintiffs

1  can't use Orange Anthem's appearance as a creditor to subject

2  About Capital to this Court's jurisdiction simply because

3  they have an alleged owner in common.  And these Plaintiffs

4  can't sustain Orange Anthem turnover claim against About

5  Capital just because it allegedly purchased an ownership

6  stake in holding company from its former owners.  And

7  Plaintiffs can't disallow Orange Anthem's valid claim against

8  the estate based on turnover claims that the estate is making

9  against different entities that allegedly have an owner in

10  common.

11         And with that, I'd like to talk about the issues

12  pertaining to About Capital first.

13              THE COURT:  Sure.

14              MR. KIRK:  So, the complaint fails to plead any

15  jurisdictional connection at all between About Capital and

16  the United States, and for that matter, I don't think they

17  please a connection between Huobi and the United States

18  either.  In Plaintiffs' opposition, they pivot to a new

19  theory that About Capital is subject to personal jurisdiction

20  because it's somehow an alter-ego of Orange Anthem.

21         Now, I want to pause and just note that using

22  Orange Anthem as a basis for jurisdiction would be a drastic

23  step in itself because Orange Anthem's only connection to

24  this forum is that it submitted a claim as a creditor, but

25  that's kind of a moot point, because in any case, the

1  Plaintiff doesn't come close to alleging that About Capital

2  and Orange Anthem are alter-egos under any applicable law.

3         If the Court applies English or Delaware law,

4  neither recognizes horizontal veil-piercing based on two

5  entities having a common owner and both of those

6  jurisdictions are very strict about disregarding the

7  corporate form to begin with and make it clear that veil-

8  piercing is an extremely rare remedy.

9         The outcome would be the same under federal common

10  law, which is what the Plaintiffs argue would apply here.

11  Veil-piercing under federal common law requires a lot more

12  than what's alleged here.  It requires a showing that the

13  corporate form was abused and that the corporations actually

14  functioned as a single entity.  Some of the factors include

15  gross undercapitalization, insolvency, siphoning of funds,

16  nonfunctioning boards, and so on.

17         Well, let's compare what's alleged here.

18  Plaintiffs allege with no supporting facts that Justin Sun

19  exercised his control over About Capital and they alleged

20  Justin Sun owns and controls Orange Anthem.  Nothing else in

21  the complaint connects About Capital and Orange Anthem.

22  Plaintiffs don't allege that they work together ooze a single

23  business or as sibling entities or even that they present

24  themselves as a collective.  They don't allege any connection

25  between Orange Anthem's trading on the FTX Exchange and

1  Alameda's trading on the Huobi Exchange and they certainly

2  don't allege any connection to About Capital, which, again,

3  they just alleged purchased Huobi from its former owners

4  before the FTX bankruptcy.

5          Instead, Plaintiffs call Orange Anthem a "front

6  company" or a "facade."  They say it's a legal fiction being

7  used to perpetrate an injustice, but they don't support those

8  labels with any facts and they also don't explain how any of

9  that relates to About Capital.  I think boiled down, the

10 Plaintiffs are dissatisfied that Orange Anthem is a creditor

11 on the FTX Exchange, but some other entities with the same

12 alleged owner haven't turned over assets to Alameda.  Now,

13 that might be inconvenient for the Plaintiffs, that the

14 Debtors chose to deal separately with these entities, but

15 that's not an abuse of the corporate form and nothing of the

16 sort is alleged.  For that reason, we don't think their

17 alter-ego theory stands up to any scrutiny and, you know,

18 just to give a couple of comparisons, you know, the facts

19 that were found sufficient in a District of Delaware case to

20 pierce the corporate veil in the Pontiaki case that they

21 cite, well, the factors that they found sufficient there

22 include gross undercapitalization, insolvency, siphoning of

23 funds, relocating to another jurisdiction during insolvency

24 proceedings, presenting the group as a single entity, and

25 non-functioning directors, even an authorization that was

1  allegedly made by a director who was deceased.  So, again,

2  for comparison, there's nothing similar in the complaint.

3         And unless Your Honor has questions on the alter-

4  ego, I just want to briefly touch on a couple of the other

5  personal jurisdiction theories.

6         THE COURT:  Sure.

7         MR. KIRK:  So, very briefly, the Plaintiffs claim

8  that there's personal jurisdiction over About Capital due to

9  violations of the automatic stay and on a conspiracy theory.

10  We think it's clear that these theories don't work for the

11  reasons set out in our briefing and I won't dwell on them,

12  but I do want to highlight the cases cited in our reply brief

13  which make clear that the automatic stay can't form an

14  independent basis for personal jurisdiction and that's the,

15  In re EAL Corp. case and that's from the District of

16  Delaware.  It states that an alleged violation of the

17  automatic stay cannot, itself, provide the basis for personal

18  jurisdiction.  We cite a couple of other cases for that

19  proposition that reached similar conclusions.  That's the In

20  re Sheehan case from the Seventh Circuit and In re Lehman

21  from the Southern District of New York.

22         And unless Your Honor has other questions on

23  jurisdiction, I'll move on to the claims on the merits.

24         THE COURT:  I do not, thank you.

25         MR. KIRK:  Okay.  So, Your Honor, again, we don't

1  need to reach the claims against About Capital since there's

2  no personal jurisdiction, but I think it's helpful to show

3  that these claims wouldn't even make it off the starting line

4  in any case.  Plaintiffs assert three claims against About

5  Capital, that's:  disallowance under Section 502(d); a

6  violation of the automatic stay; and the turnover claim.

7          Now, the disallowance claim, I think we can deal

8  with quickly, because About Capital is not a claimant, so

9  there's no claim to disallow and Plaintiffs didn't respond to

10 them.  I don't think that's in dispute that the claim should

11 be dismissed.

12         On the automatic stay, again, Plaintiffs don't

13 allege that About Capital did anything other than purchase

14 Huobi Global, so we certainly don't think they've alleged any

15 affirmative, post-petition conduct violating the automatic

16 stay, which is what's required to state a claim.  On that

17 note, I do want to flag the Third Circuit decision we cite,

18 In re Denby-Peterson, and that case holds that retaining

19 possession of estate assets does not violate the automatic

20 stay; some affirmative conduct is required.

21         Moving on to the third claim, this is the turnover

22 claim, what Plaintiffs are doing is essentially they're

23 demanding that About Capital turn over estate assets that

24 were allegedly held by the Huobi Exchange, but again, About

25 Capital is not alleged to hold any of these assets.

1  Plaintiffs alleged that in 2022, About Capital purchased an

2  ownership interest in Huobi Global from its previous owners.

3  The question is, can Plaintiffs assert a turnover claim

4  against About Capital based on its stock ownership and its

5  alleged control of those entities?

6        And we think the answer is "no" based on the

7  statute itself.  542(a) requires possession, custody, or

8  control of asset property, not ownership or control of

9  another entity that owns that property.  And that's because

10 owning the stock of an entity is not the same as owning that

11 entities assets.  It's a fundamental corporate law principle

12 and it's supported by case law that we cite in our brief,

13 which the Plaintiffs don't respond to.  That includes

14 Williams v McReady (phonetic), which says that a corporate

15 parent which owns the shares of a subsidiary does not, for

16 that reason alone, own or have legal title to the assets of

17 the subsidiary, and the FBI Wind Down case, which says a

18 parent who only maintains ownership or corporate governance,

19 control over a subsidiary, but no legal title to subsidiary's

20 assets, does not have control over that subsidiary's assets.

21        Finally, Your Honor, there's a case in this court,

22 the Sphere 3D case, and that specifically addressed a

23 turnover claim that the Debtors -- or, sorry, that the estate

24 brought against the directors of the company on the basis

25 that they could cause the entity that they were directors of

 1    to turn over assets.  The Court rejected that saying there

 2    was no allegation that the directors possessed the property

 3    of the estate.

 4          Now, the Plaintiffs try to dodge this problem by

 5    saying that the entities are alleged to be an integrated

 6    enterprise and that doesn't help them.  First of all, an

 7    integrated enterprise is a legal conclusion.  Plaintiffs

 8    don't support it with any allegations; in fact, their only

 9    allegations specific to About Capital, again, is that About

10    Capital bought Huobi Global from its previous owners.  Well,

11    that comes closer to refuting Plaintiff's theory than

12    supporting it, because it means that About Capital is now

13    allegedly standing in the shoes of the former owner.  So, why

14    would purchasing an equity ownership stake from Huobi's

15    previous owners make About Capital into part of an integrated

16    enterprise?  They don't offer any explanation.  And in any

17    case, it still fails to address our argument, which is that

18    Section 542(a) only allows them to bring a turnover claim

19    against whoever actually possesses the estate's assets.

20          Unless Your Honor has questions on that, I'd like

21    to turn to the one claim brought against Orange Anthem.

22          THE COURT:  I do not.

23          MR. KIRK:  So Plaintiffs' only claim against

24    Orange Anthem is a Section 502(d) disallowance claim.

25    Section 502(d) is built to disallow claims submitted by

1  claimants on the estate only if that claimant has been

2  adjudged liable for a turnover, preference, or avoidance

3  claim.  And that bars the estate's claim here for two

4  reasons.  First, Section 502(d) doesn't come into play at all

5  until there's a judicial determination that the claimant is

6  liable.  Commencing a turnover proceeding is not enough to

7  sustain a Section 502(d) claim and that proposition comes

8  from the OpenGate Capital case.

9          Now, Plaintiff does cite a couple cases where a

10  Section 502(d) claim was allowed to survive alongside a

11  fraudulent conveyance or a preference claim against that same

12  entity, but none of those cases address the situation here

13  where the estate hasn't even asserted the turnover claim

14  against Orange Anthem.  They haven't asserted any claim,

15  other than disallowance.  So it's bringing a standalone

16  Section 502(d) claim against Orange Anthem on the basis that

17  some other entities might someday be liable for a turnover

18  claim.  We think that's prohibited by the clear language of

19  Section 502(d), which only applies to an entity from which

20  property is recoverable in the turnover claim, not some

21  affiliated entity.

22          In their opposition brief, the Plaintiffs barely

23  address this issue.  They say that Orange Anthem can still be

24  liable as an alter-ego of Huobi or Poloniex.  Now, they don't

25  cite any cases to support that as a theory for expanding

1   Section 502(d), but more importantly, the allegations don't

2   remotely suggest that Orange Anthem is an alter-ego and we've

3   already gone through this with respect to personal

4   jurisdiction, but just to briefly recap, they allege that

5   Justin Sun owns and controls Orange Anthem and they allege,

6   generically that Polo Digital -- that's the owner of the

7   Poloniex Exchange -- and Huobi Global are also under the

8   ownership and control of Mr. Sun.

9         So, Plaintiff's suggestion seems to be that if

10  Mr. Sun owns or controls different entities in different

11  jurisdictions, they should be alter-egos and they should also

12  be collapsed together so their claims and liabilities can be

13  offset.  That's a remarkably broad theory that basically asks

14  for substantive consolidation, not of Debtors, but of the

15  creditor and other entities, just because they have an

16  alleged owner in common.  That would, again, require

17  horizontal veil-piercing, which, under English law and under

18  Delaware law, isn't a recognized theory.

19        And, here, unlike with jurisdiction, Plaintiffs

20  don't allege that, or they don't contend that federal common

21  law can apply.  Now, putting aside the fact that horizontal

22  veil-piercing isn't recognized, English law sets a very high

23  bar for veil-piercing, requiring a person to deliberately

24  evade an existing legal obligation by interposing a company

25  under its control.  That requires far more than just showing

1  common ownership or control of two entities and that's

2  because, Your Honor, the whole point of incorporation is that

3  an entity can have dealings, assets, and liabilities that are

4  separate from its owner or separate from other entities

5  controlled by its owner.

6          Plaintiffs haven't alleged that Orange Anthem's

7  corporate form was used inappropriately.  This isn't a case

8  where these entities had overlapping trading relationships

9  that the Debtors relied on collectively.  It's a case where

10 FTX and Alameda each chose to enter into different commercial

11 dealings with different entities in different jurisdictions

12 at different times.  There's no allegation suggesting that

13 anyone believed these three commercial relationships were

14 intertwined or that they allow claims to be offset against

15 each other.

16          The fact that these dealings were separate is in

17 any event for the estate, in hindsight, but that's not a

18 basis for ignoring their responsibility to return funds to

19 Orange Anthem.  Now, none of this prevents the estate from

20 working to recover the assets in dispute from other entities

21 or going to courts in appropriate jurisdictions, but it means

22 they can't take the shortcuts that they've tried to take

23 here.  Those shortcuts run afoul of due process requirements

24 in the case of About Capital and they run into fundamental

25 principles of corporate separateness in the case of both,

1  About Capital and Orange Anthem, and for these reasons, we

2  think the complaints should be dismissed against About

3  Capital and Orange Anthem with prejudice and they by that

4  Orange Anthem's claim upon the estate should be allowed

5  without any further delay.

6        Your Honor, unless you have questions, I'm happy

7  to turn it over to Mr. Strong.

8        THE COURT:  I do not.  Thank you very much.

9        MR. KIRK:  Thank you.

10       THE COURT:  I'm happy to hear from Mr. Strong.

11       MR. STRONG:  Good morning, Your Honor.

12       THE COURT:  Good morning.

13       Before you begin, I just have to ask one question.

14 Are we misspelling holdings in the case caption against your

15 client?  I can't get over the H-o-d-l-i-n-g situation.

16       MR. STRONG:  We are not, Your Honor.

17       THE COURT:  Okay.

18       MR. STRONG:  The D comes before the L in this

19 instance.

20       THE COURT:  Okay.  All right.  I wanted to get it

21 right.  I'm sorry to digress, but I had to know, since the

22 spellcheck on my -- in Word keeps popping up that we need to

23 correct that.

24       MR. STRONG:  Yes, it's definitely making

25 spellcheck go wild.

1          THE COURT:  All right.

2          MR. STRONG:  But that is, in fact, the name of the

3   entity.

4          Good morning, again, Your Honor.

5          THE COURT:  Good morning.

6          MR. STRONG:  Greg Strong of Cahill Gordon &

7   Reindel, on behalf of Digital Legend Hodlings Ltd.

8          May I please the Court?  Your Honor, the complaint

9   should be dismissed as to Digital Legend.  The scant factual

10  allegations in the complaint, with respect to Digital Legend,

11  do not establish that this Court has personal jurisdiction

12  over Digital Legend and fail to state claims against Digital

13  Legend.

14          Your Honor, the Plaintiff has a the *prima facie*

15  burden of demonstrating that Digital Legend has sufficient

16  contacts with the U.S. to give this Court jurisdiction.

17  Allegations of minimum contacts without more do not suffice.

18  The Plaintiff needs to present competent evidence to meet its

19  burden.  It has not done so here.

20          The Plaintiff attempts to cure these pleading

21  deficiencies by resorting to impermissible group pleading and

22  by putting forward several creative, but unavailing theories

23  of specific jurisdiction:  an alter-ego theory, an effects

24  theory, and a conspiracy theory.  Each of these theories

25  fails and are -- or each of these theories is an attempt to

1   establish jurisdiction over Digital Legend based on the

2   conduct of another party.  The Court should reject these

3   theories as they are uh unsupported by the factual

4   allegations in the complaint and dismiss the complaint for

5   lack of personal jurisdiction over Digital Legend.  Your

6   Honor, the complaint also fails to stake claims against

7   Digital Legend, providing another basis to dismiss.

8            Mr. Kirk covered turnover, disallowance, and

9   alleged violations of the automatic; those are the same

10  causes of action that are alleged, with respect to Digital

11  Legend and they fail for the same reasons that Mr. Kirk

12  articulated.

13           So I want to talk a little bit more about specific

14  jurisdiction if that's okay, Your Honor?

15           THE COURT:  Sure.

16           MR. STRONG:  Again, the allegations in the

17  complaint with respect to Digital Legend are scarce.  There

18  are no allegations in the complaint that Digital Legend

19  engaged in suit-related conduct that creates a substantial

20  connection with the U.S. or that it directed any activities

21  related to Plaintiff's claims at the U.S.

22           The only allegations in the complaint that are

23  specific to Digital Legend are that Digital Legend is a

24  British Virgin Islands company and together with About

25  Capital, it acquired Huobi Global and other related entities

1  in September of 2022 and this allegation in paragraph 24 that

2  lumps Digital Legend in together with Defendants Huobi

3  Global, About Capital Management, HTX, and alleges that they

4  operate as a unified, integrated enterprise sharing

5  management and operational teams.  But there are no facts to

6  support that conclusory allegation in the complaint and so

7  these allegations are plainly insufficient to establish

8  specific jurisdiction over Digital Legend because they don't

9  allege that Digital Legend undertook any activities in or

10  directed at the U.S.

11         Plaintiff attempts to address this deficient

12  pleading as to Digital Legend by lumping it together, again,

13  with the other Defendants under the defined term "Huobi" and

14  then group-pleading as to activities that Huobi undertook.

15  But even those allegations, if the Court credits them, do not

16  establish a connection to the U.S. either.  First, the

17  obligation of the Plaintiff is to show that each Defendant

18  had sufficient contacts with the United States to establish

19  personal jurisdiction and it hasn't done that here and it

20  can't rely on group pleading as a substitute for that.

21         The Plaintiff is required to establish personal

22  jurisdiction separately over each Defendant and there are a

23  variety of cases cited in our papers for that proposition,

24  Your Honor.  So, second, even if the Court were to credit the

25  Huobi allegations, they are insufficient to establish

1   specific jurisdiction, also.  The only factual allegations in

2   the complaint with respect to U.S. contact by Huobi, not by

3   Digital Legend specifically, are a handful of communications

4   with Plaintiff after the filing of the bankruptcy petition

5   that relate to the bankruptcy.

6            These allegations do not show that Huobi

7   purposefully directed its activities at the U.S. or that

8   Plaintiff's claims arise out of or relate to Huobi's

9   activities in the U.S.; instead, these allegations indicate

10  that Plaintiff, from within the U.S. after the filing of the

11  bankruptcy petition, affirmatively reached out to Huobi,

12  unspecified representatives of Huobi in attempts to create

13  incurred through those contacts.  But we know that what is

14  relevant here are not Plaintiff's contacts with the U.S., but

15  Defendant's contacts with the U.S. and there are none, Your

16  Honor.

17           Plaintiff also attempts to cure its deficient

18  pleading by claiming in its opposition that Digital Legend is

19  an alter-ego Orange Anthem and that because Orange Anthem

20  submitted to U.S. jurisdiction by filing a claim in this

21  case, that there is also jurisdiction over Digital Legend.

22  Your Honor, Mr. Kirk addressed this alter-ego theory, but

23  with respect to Digital Legend, it is a similar sort of Hail

24  Mary attempt at jurisdiction and fails for multiple reasons.

25           First, the jurisdictional acts of one company

1  cannot be imputed to another simply because they are alleged

2  to be sibling entities.  As Mr. Kirk indicated, and we agree,

3  English law and Delaware law do not recognize horizontal

4  veil-piercing and so that theory is not applicable here, Your

5  Honor, and if you're applying the laws of those

6  jurisdictions, the alter-ego theory of jurisdiction must

7  fail.

8        Secondly, if you're applying federal law, as

9  Plaintiffs indicate that you should, the alter-ego theory

10  fails anyway.  The complaint is devoid of factual allegations

11  that would be necessary to show that Digital Legend is the

12  alter-ego of Orange Anthem.  It does not allege any facts

13  relevant to the analysis, as Mr. Kirk indicated, such as the

14  failure to observe corporate formality is nonpayment of

15  dividends, insolvency, siphoning of funds.  Instead, there

16  are a handful of summary claims that do not even involve

17  Digital Legend on pages 14 and 15 of the opposition fall well

18  short of the burden here to establish alter-ego.

19        The one allegation that relates to Digital Legend

20  is a reference to a blog post that does not even mention

21  Digital Legend for the proposition that the sole director of

22  Digital Legend is an individual reported to have personal

23  connections to Justin Sun.  There is no explanation in the

24  complaint or in the opposition papers as to how this single

25  claim referencing an unverified blog post is sufficient to

1  establish that Digital Legend is an alter-ego of Orange

2  Anthem.

3          Similarly, in the 29 exhibits that Plaintiff

4  offers, Digital Legend is mentioned once in 260 pages.  The

5  one mention actually supports Digital Legend's independent

6  corporate activity and that it is not a facade, in that it's

7  a reference to a stock purchase agreement in which Digital

8  Legend was a buyer concerning the Huobi Exchange.

9          Again, Your Honor, the comparison between what is

10  alleged here and the Pontiaki facts is instructive.  Mr. Kirk

11  recited those, so I'm not going to repeat them.  But the

12  Pontiaki case is the type of case where this extreme alter-

13  ego remedy is appropriate, not this case, which is very

14  different with very different facts.

15          With respect to the effects test, Your Honor, the

16  effects test fails because it requires an is intentional tort

17  and because there are not specific allegations that Digital

18  Legend had any part in any intentional tort or in the

19  conversations with Huobi regarding the return of the Alameda

20  account assets.  Other than Plaintiff lumping Digital Legend

21  in, again, with Huobi in group pleading, there are no

22  allegations with respect to Digital Legend here.

23          So the effects theory that Plaintiff puts forward

24  is based on a supposed willful stay violation, but that

25  theory is foreclosed by the Supreme Court in Fulton, which

1  determined that merely passively retaining estate property

2  post-petition is not an affirmative act that would be a

3  violation of 362(a)(3).  So, for those reasons, Your Honor,

4  the effects theory of jurisdiction fails.

5          Finally, Your Honor, the Defendants also claim

6  conspiracy jurisdiction, but they haven't pled the elements

7  of conspiracy in the complaint.  We don't know which entities

8  conspired with each other, what they conspired to do, whether

9  there was a meeting of the minds about an unlawful object to

10  be established, whether there was some, you know, idea that a

11  substantial act or effect in furtherance of the conspiracy

12  would take place in Delaware or in the United States, or that

13  Digital Legend knew or should have known any of those things.

14  Instead, the allegations and the arguments are all conclusory

15  and they're unsupported and they don't mention Digital

16  Legend.

17          You were, that's all I have on the specific

18  jurisdiction points.  Coming back to failure to state a

19  claim, for all the reasons that Mr. Kirk articulated with

20  respect to About Capital, we think that the claims for a

21  turnover violation of the automatic stay and disallowance

22  also fail, with respect to Digital Legend.  And unless Your

23  Honor has any questions about that, I think it's been well-

24  covered, so...

25          THE COURT:  I do not.  Thank you very much.

1          MR. STRONG:  Thank you, Your Honor.

2          MR. CROKE:  Thank you, Your Honor.

3          Jake Croke from Sullivan & Cromwell on behalf of
4  the Plaintiff, FTX Recovery Trust.  Your Honor, after hearing
5  argument from the Defendants today, I want to start by
6  briefly recapping how we got here and what is at issue.  When
7  FTX declared bankruptcy more than three years ago, one of the
8  first actions the estate took was to contact the various
9  cryptocurrency exchanges where the Debtors held their assets.
10 The majority of those exchanges have now cooperated.  The
11 Defendants in this proceeding have staked out an extreme
12 approach, refusing to return tens of millions of dollars of
13 trust assets held at Huobi and Poloniex, notwithstanding that
14 they acknowledge that these assets belong to the Trust.  And
15 even worst, they're seeking to be paid out more than $10
16 million on their own claim in the estate, while improperly
17 holding those assets.

18         And so what exactly is alleged here?  As alleged
19 in the complaint, Justin Sun is a prominent crypto
20 personality and ostensible multibillionaire, with a crypto
21 empire that includes these exchanges, Huobi and Poloniex, as
22 well as the Tron Network, a blockchain protocol that is
23 deeply intertwined with Mr. Sun's exchanges and their
24 operations.  Mr. Sun controls and operates all of these
25 entities, including the ones that have appeared here today,

1  through an internally opaque corporate structure specifically

2  designed to make it difficult to track the proper entities

3  and hold them accountable.

4           And just by way of one example that we reference

5  in our opposition, Poloniex employees stated that after

6  Mr. Sun took control, he installed a corporate structure that

7  was quote, like a Russian nesting doll of obfuscation that

8  would make it to pain for any customer who wishes to sue

9  Poloniex.

10          THE COURT:  Where's that in the complaint?

11          MR. CROKE:  That's raised in our opposition, Your

12  Honor.

13          THE COURT:  So, when you write an opposition and

14  you cite things that are outside the complaint, you should

15  just amend, right.  I mean, I'm at a 12(b)(6).  Why can't

16  I -- I mean, it just seems like a waste of all our time.  The

17  opposition cited 29 exhibits.  I've never seen that before on

18  a motion to dismiss.  I assume, because that goes to the

19  (b)(2), correct?

20          MR. CROKE:  Yes, Your Honor.

21          THE COURT:  Okay.  All your claims rest on an

22  alter-ego theory?

23          MR. CROKE:  Yes, Your Honor, and that's -- I

24  think, you know, I think the complaint that we have set out

25  has alleged the core facts of this and in response to

1   the 12(b)(2) issues the Defendants have raised, we introduced

2   the opposition to address those.

3            THE COURT:  Okay.

4            MR. CROKE:  I think, you know, as we also

5   referenced in our opposition, when the SEC sued Mr. Sun and

6   various of his entities for fraud and manipulation and other

7   violations involved in the Tron Network, they also noted,

8   again, that the entities in that case were just a few of,

9   quote, several alter-egos organized by Sun, through which he

10  conducted those activities.

11           And as we did address in the complaint, Your

12  Honor, this is in paragraph 23, after Mr. Sun acquired Huobi

13  using two of the Defendants here, Digital Legend and About

14  Capital, he reorganized debtor it as HTX, which stood for

15  Huobi Tron Exchange and talked about how this was part of the

16  new era for the platform, the synergy between each of these

17  three.

18           You know, given the intentionally convoluted

19  nature of these corporate structures, the suggestion that

20  this is somehow just an impermissible group pleading or that

21  we haven't identified how each specific entity is connected

22  to the conduct is just we think, you know, Your Honor, not

23  correct.  Again, we've alleged how Digital Legend and About

24  Capital were controlled by Justin Sun, were used to acquire

25  Huobi.  As alleged in the complaint, Mr. Sun is also the sole

1  director and shareholder of Orange Anthem, a shell company in

2  the BVI and, again, it's just another vehicle used by

3  Mr. Sun, I think, as referenced in the complaint and as well

4  as in the exhibits attached to the opposition.

5          When he was opening an account to FTX and FTX

6  asked about the source of funds, Orange Anthem acknowledged

7  that it was controlled and funded entirely by Mr. Sun and

8  that the funds had come from another exchange account,

9  also 100-percent controlled and funded by Mr. Sun, registered

10 in the name of another shell company, using the email address

11 as referencing Poloniex.

12          And just to respond to something I think Mr. Kirk

13 raised earlier, this is not a situation where the allegation

14 is that there's several independently controlled and managed

15 enterprises that simply happen to have a shareholder in

16 common.  The allegation is that these are all under Mr. Sun's

17 control and acting at his direction as part of a unified

18 enterprise.

19          And I don't want to lose sight of the bigger

20 picture here.  What Mr. Sun is seeking to do on the one hand

21 is through, Orange Anthem, come to this Court, file a claim

22 in these proceedings to seek $12 million from the estate, and

23 on the other hand, hold the estate assets hostage and try to

24 evade accountability.

25          Now just talking for a moment about the two sort

1   of categories of issues the Defendants have raised, I'll

2   start with personal jurisdiction.  You know, Orange Anthem

3   does not dispute that it's subject to personal jurisdiction

4   and nor could it, but Digital Legend and About Capital have

5   each offered their own arguments as to why they're not

6   subject to jurisdiction.  Those fail for multiple reasons

7   that I'll just run through briefly here.

8           First, the Supreme Court recently held in <u>Fuld</u>

9   that in cases where the Fifth Amendment applies, personal

10  jurisdiction turns on whether the exercise of jurisdiction is

11  reasonable.  The Court emphasized that Plaintiffs are

12  entitled to a more flexible personal jurisdiction

13  (indiscernible) than the more formalistic minimum context

14  test.  And under that standard and the factors that <u>Fuld</u>

15  cites, jurisdiction here is not only permissible, but also

16  straightforward and eminently reasonable.

17          The burden on the Defendants is low.  They're all

18  corporate entities controlled by a multibillionaire and are

19  ably represented by counsel.  The United States has a strong

20  interest in litigating claims under the Bankruptcy Code to

21  ensure that the Debtors are entitled to the relief that

22  Congress has determined is appropriate.  And the Trust has a

23  strong interest in having its Chapter 11 cases heard in one

24  forum, including as to at claims submitted by the Defendants

25  here.

1          The Defendants have tried to downplay _Fuld_ by

2    arguing that it doesn't announce a new test, but that's not

3    correct.  None of the Defendants have disputed that the Fifth

4    Amendment applies here and _Fuld_ states clearly that the due

5    process clause in the Fifth Amendment necessarily permits a

6    more flexible jurisdictional inquiry.

7          THE COURT:  May I ask a question?

8          MR. CROKE:  Yes.

9          THE COURT:  If everything hinges on Justin Sun,

10   may I ask why he's not a Defendant?

11         MR. CROKE:  Your Honor, at the time we filed the

12   complaint, we've identified all the legal entities that we

13   were aware of that we believed were the proper entities that

14   you would traditionally sue in this context.  I think that

15   given the subsequent developments that have come out since

16   then and the positions that we understand the Defendants have

17   taken here, if Your Honor were so inclined, we would, of

18   course, as we note in our papers, seek leave to amend and we

19   would expect to add Mr. Sun as a Defendant.

20         THE COURT:  Okay.  Because he seems to be, under

21   your theory, the linchpin of the whole theory?

22         MR. CROKE:  Yes, Your Honor.

23         THE COURT:  Okay.  Because, really, the idea is

24   you're collapsing to him.  If you think about it, you're

25   collapsing everybody sort of up to him.

1          MR. CROKE:  Yes, yes.

2          THE COURT:  Okay.  All right.

3          MR. CROKE:  And I think on that point, just

4   turning to the alter-ego issue, I think we've already

5   discussed that Orange Anthem has filed a claim, so it's

6   subject to personal jurisdiction.  When it comes to the

7   question about the distinction between each of Orange Anthem,

8   Digital Legend, About Capital, I think this is a case, if

9   there is one, where the allegations that are alleged, set

10  forth in the complaint suggest these distinctions between

11  these entities is little more than a legal fiction and that

12  perpetuating this would clearly present an element of

13  injustice and fundamental unfairness.

14          You know, in response to Defendants' motions, the

15  declaration and the public record we cite there further

16  support those core facts.  You know, I won't run through each

17  of the details of each of these, but, again, we've already

18  alleged in the complaint exactly, the relationship between

19  Orange Anthem as the front company for Sun as the -- where

20  Sun is the sole shareholder and director and then About

21  Capital and Digital Legend, how they acquired Huobi.

22          I do want to pause here for one moment just to

23  address the elephant that's not in the room, if you will.  If

24  its motion, About Capital did not seek to introduce any

25  evidence in support of its personal jurisdiction arguments.

1  Digital Legend, in contrast, did submit a short declaration

2  from the sole director we heard mentioned earlier, Ms. Yiying

3  Jiang.  You know, we thought that was pretty interesting, you

4  know, the Defendants overarching framing throughout this case

5  has been to sort of downplay or disclaim their connections to

6  each other and to Mr. Sun, but when we looked into that, we

7  found a few interesting things, you know, we noted in our

8  opposition, Ms. Jiang has a reportedly close, familial

9  personal relationship to Mr. Sun and that she happens to

10  serve as the sole director or shareholder for many, many

11  different entities affiliated with him.

12          And as we've continued to dig into this and

13  prepared for what we expected to be her testimony here today,

14  it's really kind of remarkable.  It includes entities

15  directly connected to each of Huobi, Tron, and Poloniex, you

16  know, Huobi International Ltd., Huobi Technology Europe Ltd.,

17  Tron Network Ltd., Tron Foundation Ltd., and Augustech, LLC,

18  a Delaware LLC, which was a sole member, and as referenced in

19  materials in our opposition, Augustech was described in

20  public reports as an entity that Mr. Sun controlled and used

21  as a front to employ U.S. personnel that worked at Poloniex.

22          And after the Defendants saw in our papers that

23  we'd identified some of these connections to Ms. Jiang and

24  after we informed them that we intended to question her

25  regarding the declaration she submitted under penalty of

1  perjury, they told us that she was unavailable and would not

2  appear.  You know, we noted that she stated in her

3  declaration that if called, she could testify and that she

4  would be obligated to appear if they wanted to rely on that.

5  They never responded to that and as Your Honor is aware,

6  she's not here today.

7            We very much would have preferred that she be here

8  so Your Honor could hear from her and assess her credibility,

9  but given that the Defendants have not made her available, we

10 don't have that opportunity.  So, just, as a brief aside for

11 housekeeping there, just so there's no ambiguity in the

12 record, we would move to that declaration stricken.

13           THE COURT:  Okay.  It's not in the record, so I

14 don't think we need to do that, and thank you for bringing

15 that to my attention.

16           MR. CROKE:  So, Your Honor, I think I'll just move

17 on, briefly, to the other points we've raised, with respect

18 to the alter-ego -- to the other jurisdictional hooks.  I

19 think I won't belabor the point here, but I think with

20 respect to the effects test, and, you anyway, even if the

21 Court does not find jurisdiction under an alter-ego theory

22 About Capital and Digital Legend are subject to personal

23 jurisdiction for the effects of their willful violation of

24 the automatic stay.  I think all of the factors are met here.

25 A willful violation is an intentional tort.  They claimed at

1  one point that a stay violation is only an intentional tort,

2  if willful, and that the complaint doesn't allege that, which

3  is not correct.  It's paragraph 72 of the complaint,

4  verbatim.

5        The Trust has suffered the harm in the U.S.,

6  because those are the only activities the trust conducted

7  post-petition.  And About Capital and Digital Legend have

8  expressly aimed their conduct at the U.S. by intentionally

9  freezing this account.

10        And as to, just, again, briefly, given the time,

11  conspiracy jurisdiction, we've -- I think that's adequately

12  alleged in the complaint.  It meets the factors that were set

13  out in Institutario Bancario (phonetic) -- I'm going to

14  butcher that -- and the Defendants reference to the cases

15  they cite, the E.I. Du Pont, I think, you know, that

16  highlights the distinction there.  That case was a very

17  different posture.  Jurisdiction was not at issue.  The

18  Plaintiff was bringing a civil conspiracy tort claim and the

19  Court said that in that circumstance, the tort claim could

20  not work where the only allegation was that the two alter-

21  egos were conspiring with each other.

22        The final point, Your Honor, I'll just make,

23  briefly, on personal jurisdiction.  You know, I think we've

24  alleged that, we believe the trust has more than adequately

25  shown that the Court should exercise jurisdiction here, but

1  if the Court were of the view that the trust had not made

2  that showing with respect to either of these Defendants, I

3  believe that the only logical next step and the appropriate

4  step would be to permit jurisdictional discovery.

5          The Defendants have sort of halfheartedly in their

6  papers, argued to the contrary, but the case law is very

7  clear that the threshold to justified jurisdictional

8  discovery is very low.  There's a presumption of

9  jurisdictional discovery as to Defendants that are

10 corporations.  The claims are not, you know, quote, clearly

11 frivolous, which is the situations where courts have denied

12 it.  And the trust is alleging multiple plausible theories.

13         Moreover, About Capital and Digital Legend and

14 Orange Anthem have unique custody and control over additional

15 evidence that bears on the true relationship here between the

16 Defendants and the other entities and that, specifically, you

17 know, will include information that directly relates to the

18 other factors that they've suggested are not shown or alleged

19 like capitalization, solvency, corporate records, and the

20 non-functioning of the directors, like Ms. Jiang.

21         And courts have repeatedly stated that it's

22 appropriate in situations like this, particularly where the

23 information is uniquely in the possession of Defendants, and

24 especially where there's allegations that the Defendants have

25 intentionally obscured the information.

1          And, Your Honor, just now turning briefly to the

2   substantive 12(b)(6) claims, again, I think these issues are

3   addressed in the papers and I won't reiterate all of it here,

4   but I do want to make a few points.  First is that many of

5   the Defendants' arguments are heavily or entirely fact-based

6   and are not the basis for a dismissal under 12(b)(6); for

7   example, with respect to the turnover claim, you know, About

8   Capital and Digital Legend are not disputing that the trust's

9   turnover claim against Huobi, but only that they are not --

10  they don't control Huobi and are not Huobi.

11          The argument about, you know, that this is a

12  situation where we're essentially seeking to compel the owner

13  of a company or the directors of a company to act; that's not

14  the situation that we have alleged here.  You know, we're

15  alleging that these entities are functionally the same and

16  alter-egos of each other.

17          And I think, also, just one brief note that the

18  FBI Wind Down case that I think Mr. Kirk referenced, I think,

19  you know, read fairly, I don't think that supports their

20  argument at all.  The Court in that case explicitly said that

21  parents in subsidiary entities have no claim on the assets of

22  the other, which is the proposition that they like, but then

23  that same quote continues on, quote, unless a party seeks to

24  pierce the corporate veil and that's exactly the situation we

25  have here.

1        Turning to the claim for the violation of the

2   automatic stay, here, I think the main point that I do want

3   to raise is that the core of the Defendants' argument here is

4   based on the misapplication of the Supreme Court's decision

5   in _Fulton_ and I think this is a very important point that the

6   Defendants have sort of tried to, you know, not necessarily,

7   I think, take head on.  The Defendants argue that the conduct

8   here cannot constitute a violation of the automatic stay

9   because the exchanges merely retained the Defendants'

10  property, which they argue qualifies as passive retention,

11  but didn't give rise to liability in full.

12       I think it's extremely distinguishable when you

13  actually look at the facts of what was happening in _Fulton_

14  and what was happening here.  In _Fulton_, there were cars that

15  had been impounded for unpaid parking tickets.  They were

16  properly held by the City prior to, and for reasons unrelated

17  to the bankruptcy.  That was the _status quo_ at the time of

18  the filing and, importantly, the bankruptcy filing did not

19  prompt any changes to that _status quo_.  There was no impact

20  on the car or the debtors' rights or access, _vis-a-vis_, the

21  car.  With that backdrop, the Court held that the mere

22  passive and ongoing retention of the vehicles was not an

23  affirmative act, just a continuation of the _status quo_

24  unrelated to the bankruptcy.

25       What's happening here is the opposite.  Prior to

1  the collapse of FTX, the Debtors had free access to their

2  assets at Huobi and Poloniex.  The *status quo* was that they

3  were their assets able to be withdrawn or controlled as they

4  deemed fit, then, because of, and only because of the

5  collapse of focuses and these Chapter 11 proceedings, Huobi

6  and Poloniex affirmatively acted to freeze the debtors'

7  ability to withdraw their assets and to lock them out of

8  their accounts.  That's the explicitly affirmative act that

9  fundamentally changed the pre-bankruptcy *status quo*.  So, you

10  know, I think the notion that this is similar to just keeping

11  the assets as they were is really not what is happening here.

12          And then, finally, Your Honor, just very briefly,

13  turning to the claim for Section 502(d) disallowance, I think

14  we would be very brief here, because I think this is very are

15  straightforward under the prior rulings in these same

16  proceedings, in which Your Honor has rejected the same

17  arguments here.  I think Orange Anthem argues that as a legal

18  matter, the trust can't state the disallowance claim before

19  it's obtained a finding of liability on the trust -- on the

20  Bankruptcy Code claims.

21          But, you know, Your Honor recently decided this

22  exact issue in the Patel adversary proceeding, which is

23  consistent with earlier decisions in these cases.  In Patel,

24  the Defendants similarly argued that the 502(d) disallowance

25  should be dismissed because it's dependent on the trust's

1  ability to succeed.  Your Honor rejected that argument and

2  held that at the motion to dismiss stage, the 502(d) claim

3  survives so long as the underlying Bankruptcy Code claims

4  survive and I think the same reasoning applies here.

5          THE COURT:  But you would agree with me if the

6  Defendants don't have claims, what are we disallowing?

7          MR. CROKE:  Orange Anthem.

8          THE COURT:  Okay.  But you alleged it against all

9  the Defendants.

10          MR. CROKE:  Yes, I think, Your Honor, because

11  again, I think the theory in the complaint is the Defendants

12  are all alter-egos of each other.

13          THE COURT:  Right.  But I'm only disallowing -- I

14  can only disallow a claim that's filed against the estate and

15  only two entities of the Defendants have filed claims, right,

16  HBIT and Orange Anthem?

17          MR. CROKE:  Yeah, correct.

18          THE COURT:  All right.  So we're not trying to --

19  you know, at best, the claims against the people that didn't

20  file claims, there's no 502(d) claim.

21          MR. CROKE:  Yes, completely correct, Your Honor.

22          THE COURT:  Okay, all right.

23          MR. CROKE:  We're not asserting anything to the

24  contrary.

25          THE COURT:  I want to be clear on that, okay.

1        MR. CROKE:  Yeah.

2        THE COURT:  Okay.

3        MR. CROKE:  And I think, just, Your Honor, just to

4   conclude, unless you have any questions, I think we'd note

5   that for all the reasons we discussed today in our papers, we

6   do believe the motion should be denied and the case should

7   proceed to the next stage.  But, again, if the Court is

8   inclined to grant any of the motions, in whole or part, we

9   also reiterate our request for leave to amend the complaint,

10  which we think, you know, the courts have made clear, there

11  should be a liberal standard there.

12       THE COURT:  Okay.

13       MR. CROKE:  And unless you have anything further,

14  Your Honor, I think that's it.

15       THE COURT:  I don't think so.  Thank you very

16  much.

17       MR. CROKE:  Thank you.

18       MR. KIRK:  Your Honor, if I could take a couple of

19  minutes for rebuttal?

20       THE COURT:  Sure.

21       MR. KIRK:  Thank you.

22       So, I'll start out with on personal jurisdiction,

23  you know, they've referenced some of the, I guess, quotations

24  from various articles in the exhibits they've submitted and

25  Mr. Croke referenced reference to a Russian nesting doll,

1  that characterization.  I just want to compare something in

2  the Energy Marine [sic] case which, again, that's a case

3  where alter-ego allegations were found insufficient.  There

4  was a similar alleged Russian nesting doll of sham entities

5  and the Court's conclusion was that was a purely conclusory

6  assertion.  And things like whole ownership of most

7  subsidiary companies, shared branding and rebates, *indicia* of

8  operational control over subsidiaries all demonstrated maybe

9  a close business relationship, but not an alter-ego.  So,

10 again, that's the Energy Marine case, which found there was

11 no alter-ego, despite, basically, the same allegation of a

12 Russian nesting doll of sham entities.

13          I also just, you know, want to come back to this

14 idea that all of these, you know, all of these entities are

15 collapsing because there's, you know, a similar person,

16 Plaintiffs allege at the top of them.  Again, an individual

17 in this case, since they're referencing Mr. Sun, can own

18 multiple businesses and without more, that doesn't mean, you

19 know, that they're all horizontally connected in a way,

20 especially in a way that justifies the extraordinary remedy

21 of veil-piercing.  You know, if you had, you know, you can

22 have an individual who owns multiple different businesses and

23 that's the thing:  they're different businesses.

24 Specifically, here, for instance, aside from a reference to,

25 you know, synergies between different groups, Plaintiffs

1  don't seem to be contending, for instance, that Poloniex and

2  Huobi are the same exchange.  They're two different exchanges

3  with the same alleged owner.

4          THE COURT:  Are they still functioning exchanges?

5          MR. KIRK:  Yes, Your Honor; my understanding is

6  that they are.  Huobi has been rebranded to HTX, which is,

7  you know, I think that's referenced in some of the exhibits

8  in the complaint.

9          Mr. Croke referenced a strong interest in, you

10  know, in the United States being the forum where these claims

11  are litigated and on that, you know, Your Honor, we, of

12  course, understand the Bankruptcy Court's interest in having

13  claims litigated here, but that doesn't overcome fundamental

14  jurisdictional principles and due process, especially with

15  regard to foreign entities that don't have, you know, that

16  don't have any nexus to the United States.  And, again, these

17  counterparty relationships before the petition was filed were

18  between all foreign entities, including both, Alameda and

19  FTX, which were foreign companies.  So, again, we think that

20  they certainly don't allege a jurisdictional nexus for About

21  Capital, but, again, if you were to look through About

22  Capital to Huobi, we don't think that's appropriate, but even

23  if you were to do so, they don't allege any jurisdictional

24  nexus between Huobi and the United States either, so we think

25  that kind of ends the matter.

1          And, briefly, Your Honor, on the Fuld case, so,

2   you know, the Plaintiffs are announcing that there's a more

3   flexible inquiry.  You know, again, this was, as we mentioned

4   in our reply to their notice of supplemental authority, you

5   know, they could have raised this in their opposition.

6   Obviously, there's only a brief period before, you know,

7   between the Fuld decision and their opposition brief, but it

8   was a well-known case and so it hasn't really properly been

9   briefed.  But more importantly, I don't think Fuld would make

10  any difference here.  Fuld says that the due process inquiry

11  imposed by the Fifth Amendment is a more flexible inquiry.

12  It doesn't lay out what that standard is or how much more

13  flexible it is, but what we do know is the Court says any

14  change from the Fourteenth Amendment *status quo* should be

15  approached cautiously.

16         The Court says that it was wary about reaching

17  further and blessing more attenuated jurisdictional theories

18  and that great care and reserve are required when expanding

19  personal jurisdiction to international Defendants.  And,

20  again, here, these are international Defendants who don't

21  have any connection to the United States.

22         So, we know the Court's wary and would admonish

23  taking great care and reserve and the Court also said that

24  the Fifth Amendment may entail a similar inquiry into the

25  reasonableness of asserting personal jurisdiction.  So based

1 on that, we think that the outcome here is pretty

2 straightforward.  What would a reasonableness test look like?

3 I think it would definitely require something more than

4 having no context, whatsoever, with the United States.  So,

5 we don't think this is a closed case and then, you know, you

6 wouldn't need to pronounce a standard other than finding that

7 a lack of alleged connection to the United States wouldn't

8 meet whatever reasonableness criteria that ultimately may

9 come forward.

10          On jurisdictional discovery, Your Honor, the law

11 in the Circuit is clear that there's no right to

12 jurisdictional discovery when they don't make a *prima facie*

13 case showing personal jurisdiction.  There's no factual

14 dispute here.  There's just no alleged connection to the

15 United States and, again, the idea that it's a very low bar,

16 you know, that's only the case if they've alleged a *prima*

17 *facie* case and there's a factual dispute about whether

18 personal jurisdiction exists.  As to About Capital, they

19 haven't done that here.

20          On the question that Mr. Croke raised about

21 jurisdiction based on violating the automatic stay, again, he

22 hasn't addressed the case law that says the automatic stay

23 can't provide an independent basis for personal jurisdiction

24 and, you know, so, again, we think that that's basically the

25 sum total of what comes into play here.  If that's the

1  jurisdictional hook, then it doesn't matter if they allege

2  there were, you know, phone calls or emails or the like.

3  That alleged violation of the automatic stay can't actually

4  form a basis for personal jurisdiction.

5          THE COURT:  Well, if you don't have an alter-ego

6  claim, it doesn't matter anyway because the discussions were

7  with Huobi folks, right?

8          MR. KIRK:  That's, you know, you're correct, Your

9  Honor.  That's what we would say.

10         Now, granted, they say that Huobi should be -- you

11 know, About Capital should sort of be collapsed into Huobi.

12 But on that, you know, and that kind of relates to the

13 turnover issue, as well, Your Honor, again, looking at the

14 allegations, Plaintiffs are saying that About Capital is an

15 alter-ego of Huobi and that's what they've pleaded.  They've

16 alleged an integrated enterprise.

17         Now, again, you can't just say an integrated

18 enterprise with no supporting facts and have that, you know,

19 suffice to state an alter-ego claim, but more importantly,

20 again, I just want to drill down on what they do allege

21 about, About Capital.  So, Huobi Global used to be owned by

22 former owners.  In Plaintiffs' exhibits, they reference Leon

23 Li, the founder of Huobi Global and Sequoia, you know, an

24 investment fund that has an ownership stake.  And then their

25 exhibits state, and, you know, this is also what their

1 complaint says, is that About Capital allegedly purchased

2 that ownership stake from the former owners.

3          And if that's all that About Capital did, then

4 About Capital, as they're alleging, it sits at the top of

5 this ownership structure, it's got an equity interest in

6 Huobi Global and affiliated entities, how that turns them

7 into an equity owner just like Sequoia or Leon Li, how that

8 turns About Capital into part of an integrated enterprise

9 doesn't really make sense.  They are now the owner of this

10 enterprise and, of course, as we've set out, owning, you

11 know, owning an enterprise is not the same as being the

12 enterprise.

13          They reference, you know, again, the FBI Wind Down

14 case, so, you know, you're right that or they're correct that

15 if you pierce the corporate veil, well then, that could get

16 past the fundamental separateness between ownership of an

17 entity and ownership of the entity's assets.  But the point

18 here is all they've said is About Capital owns this

19 enterprise now.  That's not piercing the corporate veil.

20          Your Honor, on the violation of the automatic

21 stay, again, so they're saying that we -- sorry -- they're

22 saying that Huobi froze accounts and elsewhere in their

23 briefing, they reference that, you know, Huobi held the

24 accounts or held the assets hostage.  This is all sort of,

25 it's characterizations, but, ultimately, the characterization

1   is of an alleged failure to turn over assets when they were

2   demanded to be turned over.  And, again, in Denby-Peterson,

3   the Third Circuit was clear that if there are assets that

4   were in the possession of a third party prior to the petition

5   and the petition is filed and then all they do is fail to

6   turn over those assets and hold them, that's is the *status*

7   *quo*.  And there's no --

8          THE COURT:  Like the Fulton Court directly

9   addresses that issue, because it talks about the interplay

10  between turnover and the stay.  And if the interpretation of

11  the stay is what you just described, we would not need the

12  turnover section.  They go into this.  It would be

13  superfluous and we would read 542 out of the Code if that was

14  our interpretation of a stay violation.  They are very clear

15  and I'm lucky to have Judge Goldblatt who argued that case

16  here and I can just confirm my interpretation with him.  But

17  I thought Fulton is very clear on this issue.

18          But I understand, it's the way that you describe

19  the actions, as you said, that's important here.

20          MR. KIRK:  Yes, Your Honor.

21          I think, you know, the description here, you can

22  characterize conduct as appearing more affirmative or less

23  affirmative, but, again, unless you have a situation where

24  there's actually, you know, real conduct happening, then I

25  think this is just a failure to turnover, which is not the

1  same as affirmative conduct.

2          Very briefly, Your Honor, on the issue that

3  they're raising about Orange Anthem's argument that you can't

4  assert a Section 502(d) claim, they -- so, they referenced

5  the Patel decision and they say this is the same thing that

6  Your Honor recently decided.  But it's different in a

7  critical way that they're not addressing and that is, it's

8  one thing if you have parallel claims against the same

9  Defendant for disallowance and turnover; again, you know, I

10  think it's sort of an open question, because OpenGate Capital

11  does, I think, does go a different way, but I acknowledge

12  that there are cases that just say, let's let both of these

13  claims get by.

14          And, actually, you know, there's some, I think,

15  indirect support in Rule 18, which under that rule, if a --

16  you can set aside a conveyance that's fraudulent as to that

17  Plaintiff without first obtaining a judgment for the money.

18  And, again, here, the issue is they haven't asserted a claim

19  for turnover preference or fraudulent conveyance against

20  Orange Anthem; it's just a standalone 502(d) claim.  In none

21  of the cases they've cited where parallel claims against the

22  same defendant are allowed to proceed.  None of, you know,

23  none of those involve a Section 502(d) claim that's not

24  accompanied by a turnover claim.

25          And finally, Your Honor, on leave to amend, Orange

1   Anthem, specifically, just has, you know, I want to raise one

2   issue on behalf of Orange Anthem which is, again, Plaintiffs

3   have had a lot of time.  This complaint was filed over a year

4   ago and, you know, importantly, here, they've essentially

5   already amended the complaint through the opposition.

6   That's 260 pages of new exhibits.  I mean, this is,

7   essentially, an amendment and, you know, Your Honor had a

8   little bit of discussion about why didn't they just amend.

9         But the point is, you know, you've taken these

10  exhibits head on and we think that we've kind of assessed

11  everything that the Plaintiffs have to say here and having

12  already essentially amended through their opposition for

13  Orange Anthem, in particular, but we don't think it's

14  appropriate that a creditor of the estate that's waiting --

15  that has waited for years to get millions of dollars of

16  assets back from the estate, that it needs to, you know, wait

17  for another amendment.  And so, we think that, you know, the

18  dismissal as to Orange Anthem and as to About Capital should

19  be with prejudice.

20        And I think with that, Your Honor, I'm just going

21  to check my notes very quickly, but I think I'll now turn it

22  over to Mr. Strong.

23        THE COURT:  Okay, thank you.

24        MR. KIRK:  Thank you, Your Honor.

25      (Pause)

1          MR. STRONG:  Thank you, Your Honor.

2          Good morning, again.  I'll be very brief, but I

3    did want to just address a few remaining points here.  First,

4    with respect to the request for jurisdictional discovery, we

5    agree with Mr. Kirk that the Plaintiff has not met its burden

6    of establishing a *prima facie* basis for personal jurisdiction

7    and, therefore, is not entitled to jurisdictional discovery.

8    That is what the law is in this Circuit and as we've

9    discussed throughout this morning, they haven't met that

10   *prima facie* burden and they should not be permitted to take

11   jurisdictional discovery in an attempt to secure that

12   failure, Your Honor.

13         Secondly, when Mr. Croke first addressed the

14   Court, he highlighted the involvement of Mr. Sun in some of

15   these entities and repeatedly said that they are operated and

16   controlled by Mr. Sun.  But when you look at the complaint

17   and the allegations in the complaint, there are no facts to

18   support the contention that Mr. Sun operates and controls

19   these entities.  Every time Mr. Sun's involvement is

20   mentioned, it's upon information and belief and, Your Honor,

21   that is not sufficient, in terms of meeting the pleading

22   standards to show that.

23         With respect to Fuld, I agree with Mr. Kirk that

24   under the Fifth Amendment, there is a more flexible standard,

25   but Fuld does not really lay out what that standard is and

1  the Plaintiffs did not actually Fuld in their opposition;

2  although, there was a short window in which to do so, they

3  didn't make that argument, and so that argument is waived.

4         But in any event, the allegations in the complaint

5  simply don't meet any potential standard under Fuld because

6  it's not reasonable to assert personal jurisdiction over

7  Digital Legend, given the scant allegations in the complaint

8  that specifically address Digital Legend.

9         Finally, Your Honor, on Plaintiffs' request for

10  leave to amend the complaint, the Court should deny that

11  request, especially, with respect to Digital Legend.

12  Plaintiff does not indicate anything about how they would

13  amend the complaint beyond the 29 exhibits and 260 pages that

14  they've already attached to the opposition in order to

15  enhance the complaint.  Those 29 exhibits and 260 pages

16  mention Digital Legend exactly once and for this reason,

17  Plaintiffs' conclusory and unsupported assertion that it will

18  cure deficiencies as to Digital Legend should not be credited

19  and they should not be given leave to amend.

20         Finally, Your Honor, with respect to the issue on

21  the declaration of Yiying Jiang.  We're here for oral

22  argument on the motion to dismiss.  It's been fully briefed

23  for over four months.  The declaration was filed in

24  connection with our motion a long, long time ago.  It's not

25  addressed by the Plaintiffs in their opposition and it hasn't

1  been addressed by Plaintiffs until very, very recently, where

2  they sought to determine whether Ms. Yiying Jiang would be

3  present here today.

4           We're not here for an evidentiary hearing, Your

5  Honor; we're here for oral argument and if Plaintiffs wanted

6  to depose her or cross-examine her, the time to do that would

7  have been months ago.

8           THE COURT:  Okay.  All right.  Thank you all very

9  much.

10          MR. STRONG:  Thank you, Your Honor.

11          THE COURT:  I'm going to take a short break and

12  I'm going to come back and rule from the bench.

13       (Recess taken at 10:36 a.m.)

14       (Proceedings resumed at 10:53 a.m.)

15          THE CLERK:  All rise.

16          THE COURT:  Please be seated.

17          I usually don't rule from the bench on these

18  things, but we have a ton of things under advisement, not

19  just in FTX, in other things, so I need to sort of move

20  quickly and like you mentioned, you've been waiting a long

21  time on this, and for that, I apologize, but I can dispense

22  with the motions today.

23          I agree with the moving Defendants that the

24  complaint should be dismissed with respect to the claims

25  asserted against them; however, I don't see a reason at this

1  point not to allow the trust the opportunity to seek leave to

2  amend if they wish to do so, and therefore, the dismissal

3  will be without prejudice.

4          Plaintiff has not alleged sufficient facts to

5  support their claims against the moving Defendants under

6  Rule 12(b)(6).  With respect to the turnover claims, it rests

7  upon alter-ego theories to connect the moving Defendants to

8  Huobi and Poloniex -- I don't know -- I'm butchering that.

9  I'll call it "Polo" going forward.  And those are the

10 entities that are alleged to hold the estate funds and the

11 trust failed to make allegations necessary to support the

12 alter-ego theories in the complaint and, therefore, the

13 turnover claim fails at the pleading stage.

14          The alleged facts relied upon the trust to support

15 the alter-ego theory are substantially set forth in its

16 opposition brief, not the complaint and, in particular, news

17 articles submitted with the opposition brief that are hearsay

18 and cannot be relied upon to buttress the complaint's

19 allegations at the 12(b)(6) stage.

20          The little facts alleged on this matter in the

21 complaint are insufficient to support alter-ego no matter

22 what law is applied.  At best, the allegations establish that

23 Justin Sun owns and controls the entities before me, but that

24 is insufficient for an alter-ego claim under any of the laws

25 that could be applied, as I mentioned, even when the fact of

1  ownership and control is combined with the alleged use of

2  funds on the Polo exchange to fund the Orange Anthem account

3  or that operational management teams maybe had been shared.

4          With respect to the trust's claim for violation of

5  the automatic stay, this claim fails against the moving

6  Defendants also due to the failure to plead alter-ego, but

7  also because the Supreme Court articulated in Fulton, a mere

8  retention of estate property following the petition date, as

9  has been alleged here, does not violate the stay.

10          Lastly, with respect to the Section 502(d) claim

11 against Orange Anthem, that necessarily fails without a

12 sufficiently stated alter-ego theory and other substantive

13 claims that would support a 502(d) claim.  And without a

14 claim to disallow, the Section 502(d) claim against About

15 Capital and Digital Legend also fail.

16          I will permit the trust 30 days to seek leave to

17 amend under Rule 15 and I'll enter an order memorializing

18 this and my dismissal ruling today.  I acknowledge that

19 digital capital and about -- sorry -- Digital Legend and

20 About Capital, preliminarily request dismissal under

21 Rule 12(b)(2) for lack of personal jurisdiction and that I

22 just dismissed the claims under Rule 12(b)(6).  And,

23 typically, a Court would address personal jurisdiction issues

24 first, but here, I jumped ahead, largely because the issues

25 overlap between the personal jurisdiction bases and the

1  substantive claims and it's clear to me that the substantive

2  claims haven't been alleged.

3           Additionally, the jurisdictional issues are

4  complex.  The jurisdictional discovery, if I permitted it,

5  would be costly and there's just no need to deal with that

6  when the claims haven't been sufficiently alleged.

7           I'll say one thing, I did look at the news

8  articles and information that was attached and I'll tell you

9  that if that is what is submitted with an amended complaint,

10 it most likely will not pass muster.  I expect more in a

11 complaint with respect to alter-ego or conspiracy or more.

12 So that's just a little preview if we're going to continue

13 down this path of these Defendants.  I would expect the

14 factors that support alter-ego claims to be supported by

15 facts that are alleged in the complaint and control and

16 ownership is just one fact.  And in Delaware, we respect the

17 corporate form, so you need more, okay?

18           As I mentioned, I will enter an order

19 memorializing this ruling today.  I'll look forward to

20 receiving a motion to amend if you so see the need, given

21 that I believe the other Defendants haven't filed motions to

22 dismiss, but I haven't been keeping up with the docket, so

23 I'll leave you to make that decision and I'll consider any

24 motion to amend and if it's disputed at that time.

25           But thank you all very much for accommodating the

1  late and the delay and for coming down in person to make the

2  arguments; I very much appreciate it.  With that, I will

3  leave you be.  I wish you all a wonderful holiday if you

4  don't see any of you before then and wish you a great new

5  year.  So, everyone take care.

6          We'll stand adjourned.

7      (Proceedings concluded at 10:58 a.m.)

1                          CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7    /s/ William J. Garling                    December 9, 2025

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25