**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,<br><br>               Debtors.<br><hr>FTX RECOVERY TRUST,<br><br>               Plaintiff,<br><br>           - against -<br><br>HUOBI GLOBAL LTD., ABOUT CAPITAL MANAGEMENT (HK) CO., LTD., DIGITAL LEGEND HODLINGS LTD., HUOBI GLOBAL S.A., ORANGE ANTHEM LTD., POLO DIGITAL ASSETS, LTD., and YUCHEN "JUSTIN" SUN<br><br>               Defendants. | Chapter 11<br><br>Case No. 22-11068 (KBO)<br><br>(Jointly Administered)<br><br><br><br><br>Adv. Pro. No. 24-50219 (KBO) |

**FTX RECOVERY TRUST'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS
ABOUT CAPITAL MANAGEMENT (HK) CO., LTD., ORANGE ANTHEM LTD., JUSTIN
SUN, DIGITAL LEGEND HODLINGS LTD., AND HUOBI GLOBAL S.A.'S
<u>MOTIONS TO DISMISS THE TRUST'S AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ...................................................................................... 3

     A.     Justin Sun Builds a Cryptocurrency Empire and Acquires Huobi and Poloniex ...................................................................................................... 3

     B.     Alameda Opens Accounts on the Huobi and Poloniex Exchanges ......................... 4

     C.     As FTX Collapses, Sun Leverages the Crisis ................................................. 4

     D.     Orange Anthem Seeks to Obscure Its Connections ......................................... 6

ARGUMENT ...................................................................................................... 7

I.     DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION ................................. 7

     A.     Legal Standard ...................................................................................... 7

     B.     The Exercise of Personal Jurisdiction Satisfies the Flexible Fifth Amendment Standard ............................................................................. 8

           1.     The Exercise of Personal Jurisdiction Is Reasonable ................................. 8

           2.     The Moving Defendants Are Subject to Personal Jurisdiction as the Alter Egos of Orange Anthem ...................................................... 10

               i.     Sun's Entities Have Failed to Observe Corporate Formalities ..... 12

               ii.     Sun Uses His Entities as Mere Façades to Advance Personal Interests ...................................................................... 15

               iii.     Sun's Entities Maintain Non-Functioning and Overlapping Directors .................................................................... 16

               iv.     Sun's Abuse of the Corporate Form Presents Overall Elements of Fraud, Injustice and Unfairness ............................... 17

     C.     The Jurisdictional Defendants Are Also Subject to Personal Jurisdiction for the "Effects" of Their Willful Automatic Stay Violation ............................. 18

II.    IN THE ALTERNATIVE, THE TRUST SHOULD BE GRANTED JURISDICTIONAL DISCOVERY ............................................................................................... 20

III. THE FAC ADEQUATELY PLEADS CLAIMS FOR TURNOVER, AUTOMATIC STAY VIOLATIONS, DISALLOWANCE, AND EQUITABLE SUBORDINATION ............................................................................................... 21

    A.    Legal Standard .................................................................................21

    B.    The FAC Has Already Survived the Rule 12(b)(6) Standard at the Leave-to-Amend Stage .............................................................................21

    C.    The Moving Defendants' Corporate-Form Arguments Raise Factual Questions That Cannot Defeat Plausibility at This Stage ......................................22

        1.    The Trust Plausibly Pleads Alter Ego Liability ........................................22

        2.    Defendants Cannot Defeat the Trust's Well-Pled Alter Ego Theory by Mischaracterizing the Trust's Theory ..................................25

    D.    The FAC States a Claim for Turnover ................................................25

    E.    The FAC States a Claim for Disallowance ..........................................27

    F.    The FAC States a Claim for Violation of the Automatic Stay Against Sun, Huobi, and Poloniex ..................................................................27

    G.    The FAC States a Claim for Equitable Subordination ..........................28

CONCLUSION ............................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abeinsa Holding, Inc.*,
  645 B.R. 680 (Bankr. D. Del. 2022) ............................................................................25

*In re Adams*,
  27 B.R. 582 (D. Del. 1983) ..........................................................................................19

*In re Am. Home Mortg. Holding*,
  458 B.R. 161 (Bankr. D. Del. 2011) ......................................................................25, 26

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009) ......................................................................................................21

*In re Autobacs Strauss, Inc.*,
  473 B.R. 525 (Bankr. D. Del. 2012) .............................................................................29

*Baker* v. *LivaNova PLC*,
  2016 WL 11587245 (M.D. Pa. Sep. 20, 2016) ...............................................................3

*Bd. of Trs. of Teamsters Loc. 863 Pension Fund* v. *Foodtown, Inc.*,
  296 F.3d 164 (3d Cir. 2002) .........................................................................................13

*Berrios-Bones* v. *Nexidis, LLC*,
  2007 WL 3231549 (D. Utah Oct. 30, 2007) .................................................................23

*Bhd. of Locomotive Eng'rs* v. *Springfield Terminal Ry. Co.*,
  210 F.3d 18 (1st Cir. 2000) ...........................................................................................11

*bioMérieux, S.A.* v. *Hologic, Inc.*,
  2018 WL 4647483 (D. Del. Sep. 26, 2018) ..................................................................20

*Black* v. *Montgomery Cnty.*,
  835 F.3d 358 (3d Cir. 2016) .........................................................................................21

*Blair* v. *Infineon Techs. AG*,
  720 F. Supp. 2d 462 (D. Del. 2010) ..............................................................................12

*In re Blatstein*,
  192 F.3d 88 (3d Cir. 1999) ...........................................................................................11

*In re Bowen Transps., Inc.*,
  551 F.2d 171 (7th Cir. 1977) ........................................................................................11

*In re Bozel S.A.*,
    434 B.R. 86 (Bankr. S.D.N.Y. 2010) ........................................................................9

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) .............................................................................3, 21

*Calder* v. *Jones*,
    465 U.S. 783 (1984) ..............................................................................................18

*Citicorp Venture Cap., Ltd.* v. *Comm' of Creditors Holding Unsecured Claims*,
    323 F.3d 228 (3d Cir. 2003) ..................................................................................30

*Compagnie des Bauxites de Guinee* v. *L'Union Atlantique S.A. d'Assurances*,
    723 F.2d 357 (3d Cir. 1983) ..................................................................................20

*Compagnie des Grands Hôtels d'Afrique S.A.* v. *Starwood Cap. Grp. Glob. I LLC*,
    2019 WL 148454 (D. Del. Jan. 9, 2019) ...............................................................13

*Dan Dee Int'l, LLC* v. *Glob. New Ventures Grp. LC*,
    2024 WL 3043430 (D. Del. June 18, 2024) ..........................................................20

*In re Davis*,
    177 B.R. 907 (B.A.P. 9th Cir. 1995) .....................................................................18

*In re Daya Meds., Inc.*,
    560 B.R. 855 (Bankr. S.D. Fla. 2016) ...................................................................28

*Del. Display Grp. LLC* v. *Lenovo Grp. Ltd.*,
    2016 WL 720977 (D. Del. Feb. 23, 2016) ............................................................22

*Deutsche Telekom, A.G.* v. *Republic of India*,
    155 F.4th 694 (D.C. Cir. 2025) ...............................................................................8

*Diaz* v. *FCA US LLC*,
    693 F. Supp. 3d 425 (D. Del. 2023) ......................................................................23

*Doe* v. *Sylvester*,
    2001 WL 1064810 (D. Del. Sep. 11, 2001) ..........................................................23

*El Paso Firemen & Policemen's Pension Fund* v. *InnovAge Holding Corp.*,
    773 F. Supp. 3d 1236 (D. Colo. 2025) ..................................................................23

*Ellison* v. *Am. Bd. of Orthopaedic Surgery*,
    11 F.4th 200 (3d Cir. 2021) .....................................................................................7

*Eurofins Pharma US Holdings* v. *BioAlliance Pharma SA*,
    623 F.3d 147 (3d Cir. 2010) ..................................................................................20

*In re Fairfield Sentry Ltd.*,
    671 B.R. 5 (Bankr. S.D.N.Y. 2025) ............................................................................8

*Feingold* v. *State Farm Mut. Auto. Ins. Co.*,
    2012 WL 1106653 (E.D. Pa. Apr. 3, 2012) ...........................................................23

*Finjan LLC* v. *Trustwave Holdings, Inc.*,
    2021 WL 5051147 (D. Del. Oct. 29, 2021) ..............................................................7

*In re Firestar Diamond, Inc.*,
    654 B.R. 836 (Bankr. S.D.N.Y. 2023) ......................................................................9

*In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*,
    751 F.3d 150 (3d Cir. 2014) ......................................................................................9

*In re FTX Trading Ltd.*,
    2023 WL 8814216 (Bankr. D. Del. Dec. 20, 2023) ..................................................7

*In re FTX Trading Ltd.*,
    2024 WL 4562675 (Bankr. D. Del. Oct. 23, 2024) ................................................27

*In re FTX Trading Ltd.*,
    2025 WL 3008666 (Bankr. D. Del. Oct. 27, 2025) ................................................30

*Fuld* v. *Palestine Liberation Organization*,
    606 U.S. 1 (2025) ......................................................................................................8

*Gambone* v. *Lite Rock Drywall*,
    288 F. App'x 9 (3d Cir. 2008) ................................................................................20

*Giaccone* v. *Canopius U.S. Ins. Co.*,
    133 F. Supp. 3d 668 (D.N.J. 2015) .........................................................................21

*In re Glenn*,
    677 B.R. 871 (Bankr. E.D. Pa. 2026) .....................................................................28

*In re Glob. Cord Blood Corp. Sec. Litig.*,
    820 F. Supp. 3d 221 (S.D.N.Y. 2026) .....................................................................10

*Grand Ent. Grp., Ltd.* v. *Star Media Sales, Inc.*,
    988 F.2d 476 (3d Cir. 1993) ......................................................................................9

*Great W. Mining & Min. Co.* v. *Fox Rothschild LLP*,
    615 F.3d 159 (3d Cir. 2010) ....................................................................................22

*Harrison* v. *Soroof Int'l, Inc.*,
    320 F. Supp. 3d 602 (D. Del. 2018) ........................................................................24

*Henderson* v. *Samuel, Son & Co. USA Inc.*,
  2025 WL 1681817 (C.D. Cal. Apr. 24, 2025) ................................................................25, 26

*Highland CDO Opportunity Master Fund, L.P.* v. *Citibank, N.A.*,
  270 F. Supp. 3d 716 (S.D.N.Y. 2017)....................................................................................23

*IMO Indus., Inc.* v. *Kiekert AG*,
  155 F.3d 254 (3d Cir. 1998)..............................................................................................18, 19

*Jekyll Island-State Park Auth.* v. *Polygroup Macau Ltd.*,
  140 F.4th 1304 (11th Cir. 2025) ..............................................................................................9

*Jenner* v. *Volvo Cars of N. Am. LLC*,
  2023 WL 2554697 (D.N.J. Mar. 17, 2023).............................................................................23

*In re KB Toys Inc.*,
  736 F.3d 247 (3d Cir. 2013)....................................................................................................27

*King* v. *Bon Charge*,
  823 F. Supp. 3d 508 (D. Del. 2025).........................................................................................8

*In re Klarchek*,
  508 B.R. 386 (Bankr. N.D. Ill. 2014) .....................................................................................28

*In re Kwok*,
  2025 WL 1185195 (Bankr. D. Conn. Apr. 23, 2025) ........................................................10, 24

*Langenkamp* v. *Culp*,
  498 U.S. 42 (1990)...................................................................................................................10

*In re Lipitor Antitrust Litig.*,
  855 F.3d 126 (3d Cir. 2017)......................................................................................................7

*Loan Source Inc.* v. *NEWITY LLC*,
  2026 WL 796920 (D. Del. Mar. 23, 2026) ..............................................................................25

*Longmeadow One Solar LLC* v. *Trina Solar Co.*,
  2025 U.S. Dist. LEXIS 167675 (D.N.J. Aug. 28, 2025)..........................................................26

*Loosier* v. *Unknown Med. Dr.*,
  435 F. App'x 302 (5th Cir. 2010) ...........................................................................................26

*In re Lyondell Chem. Co.*,
  543 B.R. 127 (Bankr. S.D.N.Y. 2016).......................................................................................8

*Mallinckrodt IP Unlimited Co.* v. *B. Braun Med., Inc.*,
  2018 WL 2254540 (D. Del. May 17, 2018).............................................................................14

*Marino* v. *Brighton Gardens of Mountainside*,
    697 F. Supp. 3d 224 (D.N.J. 2023) ..................................................................22

*Mason* v. *Network of Wilmington, Inc.*,
    2005 WL 1653954 (Del. Ch. July 1, 2005)......................................................24

*In re Maxus Energy Corp.*,
    641 B.R. 467 (Bankr. D. Del. 2022) ....................................................10, 23, 24

*McDermott* v. *Clondalkin Grp, Inc.*,
    649 F. App'x 263 (3d Cir. 2016) ......................................................................24

*McMahon* v. *Volkswagen Aktiengesellschaft*,
    2023 WL 4045156 (D.N.J. June 16, 2023) ......................................................26

*Md. Elec. Indus. Health Fund* v. *Masters Elec., Inc.*,
    2016 WL 164301 (D. Md. Jan. 13, 2016)........................................................23

*Metcalfe* v. *Renaissance Marine, Inc.*,
    566 F.3d 324 (3d Cir. 2009)..............................................................................20

*In re NWL Holdings, Inc.*,
    2013 WL 2436667 (Bankr. D. Del. June 4, 2013)...........................................27

*Opheim* v. *Volkswagen Aktiengesellschaft*,
    2021 WL 2621689 (D.N.J. June 25, 2021) ......................................................26

*In re Opus E., L.L.C.*,
    480 B.R. 561 (Bankr. D. Del. 2012) .................................................................24

*In re Parker*,
    644 B.R. 805 (N.D. Cal. 2021) .........................................................................18

*Plumbing Supply, LLC* v. *ExxonMobil Oil Corp.*,
    2016 WL 3034385 (S.D.N.Y. May 27, 2016) .................................................22

*Pontiaki Special Mar. Enter.* v. *Taleveras Grp.*,
    2016 WL 4497058 (D. Del. Aug. 26, 2016) ...............................................11, 12

*Prestan Prods. LLC* v. *Innosonian Am., LLC*,
    2024 WL 278985 (D.N.J. Jan. 25, 2024)..........................................................20

*Pritzker* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    7 F.3d 1110 (3d Cir. 1993)................................................................................11

*In re Prudential Lines, Inc.*,
    928 F.2d 565 (2d Cir. 1991)..............................................................................28

*Radian Guar. Inc.* v. *Bolen*,
    18 F. Supp. 3d 635 (E.D. Pa. 2014) ................................................................10

*Rocke* v. *Pebble Beach Co.*,
    541 F. App'x 208 (3d Cir. 2013) ....................................................................18

*Schmidt* v. *Skolas*,
    770 F.3d 241 (3d Cir. 2014) ............................................................................21

*Shuker* v. *Smith & Nephew, PLC*,
    885 F.3d 760 (3d Cir. 2018) ............................................................................21

*Sierra* v. *Trafigura Trading LLC*,
    2024 WL 3823018 (D. Del. Aug. 14, 2024) ....................................................10

*Sinochem Int'l Co.* v. *Malay. Int'l Shipping Corp.*,
    549 U.S. 422 (2007) ..........................................................................................7

*State Farm Mut., Auto. Ins. Co.* v. *Tz'doko V'Chesed of Klausenberg*,
    543 F. Supp. 2d 424 (E.D. Pa. 2008) ..............................................................20

*Steel Co.* v. *Citizens for a Better Env't*,
    523 U.S. 83 (1998) ............................................................................................7

*In re Student Fin. Corp.*,
    335 B.R. 539 (D. Del. 2005) ............................................................................21

*In re Thgh Liquidating LLC*,
    2020 WL 5409002 (D. Del. Sep. 9, 2020) .......................................................28

*Time Share Vacation Club* v. *Atl. Resorts, Ltd.*,
    735 F.2d 61 (3d Cir. 1984) ............................................................................3, 7

*Toys "R" Us, Inc.* v. *Step Two, S.A.*,
    318 F.3d 446 (3d Cir. 2003) ..............................................................................7

*Trs. of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds* v. *Lutyk*,
    332 F.3d 188 (3d Cir. 2003) ............................................................................11

*Twentieth Century Fox Int'l Corp.* v. *Scriba*,
    385 F. App'x 651 (9th Cir. 2010) ....................................................................21

*UBS Sec. LLC* v. *Dondero*,
    2025 WL 928901 (N.Y. Sup. Ct. Mar. 25, 2025) ............................................23

*In re UD Dissolution Corp.*,
    629 B.R. 11 (Bankr. D. Del. 2021) ....................................................................9

*In re Vaso Active Pharms., Inc.*,
  2012 WL 4793241 (Bankr. D. Del. Oct. 9, 2012) ................................................................29

*Williams* v. *Netflix, Inc.*,
  2023 WL 3478568 (D. Del. May 16, 2023).........................................................................9

*In re Winstar Commc'ns, Inc.*,
  554 F.3d 382 (3d Cir. 2009)...........................................................................................29, 30

*In re Zohar III*,
  639 B.R. 73 (Bankr. D. Del. 2022) ....................................................................................30

**Statutes**

11 U.S.C. § 362 .....................................................................................................................27

11 U.S.C. § 502 .....................................................................................................................27

11 U.S.C. § 542 ...................................................................................................................2, 25

**Other Authorities**

*Retention*, *Black's Law Dictionary* (12th ed. 2024) ...................................................................18

Fed. R. Civ. P. 12(b)(2).............................................................................................................7

Fed. R. Civ. P. 12(b)(6)........................................................................................................2, 21

U.S. Const. amend. V............................................................................................................2, 8

**GLOSSARY**

| | |
|---|---|
| **About Capital** | About Capital Management (HK) Co., Ltd. |
| **AC Brief (AC Br.)** | Brief of Defendants About Capital Management (HK) Co., Ltd.[,] Orange Anthem Ltd., and Justin Sun in Support of Motion to Dismiss Amended Complaint [Dkt. No. 79] |
| **AC Defendants** | About Capital, Orange Anthem, and Sun |
| **Alameda** | Alameda Research Ltd. |
| **Alameda Huobi Account** | An account that Alameda opened on Huobi, with an account number ending in -8170 |
| **Alameda Poloniex Account** | An account that Samuel Bankman-Fried opened on Poloniex |
| **Corporate Defendants** | Defendants About Capital, Digital Legend, Huobi Global S.A., and Orange Anthem |
| **Chapter 11 Cases** | The above-captioned chapter 11 cases |
| **Debtors** | FTX Trading Ltd. and its affiliated debtors and debtors-in-possession |
| **Dec. 8 Hr'g Tr.** | The transcript from the oral argument held in the above-captioned adversary proceeding on December 8, 2025 |
| **Digital Legend** | Digital Legend Hodlings Ltd. |
| **DL Brief (DL Br.)** | Digital Legend Hodlings Ltd.'s and Huobi Global S.A.'s Memorandum of Law in Support of Their Motion to Dismiss Plaintiff's Amended Complaint [Dkt. No. 81] |
| **DL Defendants** | Digital Legend and Huobi Global S.A. |
| **FAC** | Amended Complaint for Turnover of Assets Pursuant to 11 U.S.C. § 542, for Violations of the Automatic Stay Pursuant to 11 U.S.C. § 362, and for Disallowance or Subordination of Claims Pursuant to 11 U.S.C. §§ 502 and 510 [Dkt. No. 75] |

| | |
|---|---|
| **FCA** | The United Kingdom's Financial Conduct Authority |
| **FTX.com** | The trade name of FTX Trading Ltd. |
| **HGSA** | Huobi Global S.A. |
| **Huobi** | About Capital, Digital Legend, Huobi Global Ltd., and HGSA |
| **Jurisdictional Defendants** | About Capital, Digital Legend, HGSA, and Sun |
| **Motion for Leave to Amend** | Plaintiff's Motion for Leave to Amend Complaint [Dkt. No. 65] |
| **Moving Defendants** | The AC Defendants and DL Defendants, collectively, all of whom have moved to dismiss the FAC |
| **Motions** | Motion to Dismiss Adversary Proceeding Filed by Digital Legend Hodlings Ltd., Huobi Global, S.A.. [Dkt. No. 80] and Motion to Dismiss Adversary Proceeding Filed by About Capital Management (HK) Co., Ltd., Orange Anthem Ltd., Yuchen "Justin" Sun [Dkt. No. 79] |
| **Orange Anthem** | Orange Anthem Ltd. |
| **Petition Date** | November 11 and November 14, 2022, as applicable |
| **Poloniex** | Polo Digital Assets, Ltd. |
| **Sun** | Yuchen "Justin" Sun |
| **Trust** | The FTX Recovery Trust |

## PRELIMINARY STATEMENT

For more than three years, Justin Sun and his sprawling corporate network have refused to return approximately $27 million of the Trust's property held on the Huobi and Poloniex exchanges. Throughout that period, Sun and his affiliates have shuffled the Trust from one entity to another, forcing the Trust to chase its own property across Sun's web of entities. At the same time, Sun has attempted to use Defendant Orange Anthem's $12 million claim to siphon further value from the estate.

Sun assembled his network of entities to enable precisely this kind of inequitable result. Indeed, Sun has made little attempt to maintain the fiction of corporate separateness: he has described Huobi's funds as "Brother Sun's money," acknowledged that Huobi is "one of Mr. Sun's own businesses," referred to Orange Anthem's claim as his own, and regularly demonstrated his complete control over Huobi, Poloniex, Orange Anthem, and other related entities.

Defendant HGSA's conduct during the course of this litigation highlights Sun's ongoing shell game. In February 2026, a HGSA director swore under penalty of perjury in federal court that HGSA "owns and operates HTX" (*i.e.*, Huobi) and was the rightful owner of funds stolen from Huobi. Yet mere months later, and just days after the Moving Defendants filed the Motions in this action, the United Kingdom designated HGSA as a sanctioned entity for allegedly facilitating $1.5 billion in transfers in violation of Russian sanctions, and Huobi and Sun responded by shifting gears, asserting that "Huobi Global S.A. is distinct from the online HTX exchange."

Such conduct is precisely the kind of opportunistic shape-shifting that the Moving Defendants ask the Court to reward by treating their corporate opacity as a complete defense to the FAC. This Court should reject the Moving Defendants' arguments as to why this Court may not exercise jurisdiction or why the FAC fails to state a claim.

*First*, under the flexible Fifth Amendment standard, jurisdiction is plainly reasonable as to all Defendants.  Orange Anthem also submitted to this Court's jurisdiction when it filed a $12 million proof of claim, and as Orange Anthem's alter egos, the Jurisdictional Defendants are likewise subject to jurisdiction on that basis.  And the Jurisdictional Defendants also are subject to jurisdiction under the "effects" test for their violations of the automatic stay.  To the extent there is any doubt about jurisdiction, the Court should permit jurisdictional discovery—the Trust has shown the possible existence of the requisite contacts, and jurisdictional discovery is presumptively appropriate for corporate defendants, particularly where the Moving Defendants have deliberately obscured the relevant relationships.

*Second*, the Moving Defendants' Rule 12(b)(6) arguments largely mirror the arguments that About Capital, Digital Legend, and Orange Anthem made in opposing the Motion for Leave to Amend.  The Rule 12(b)(6) standard is the same one that applied to that motion, and no Defendant has explained why the same legal standard should produce a different result now.

*Third*, the Moving Defendants cannot evade liability by describing the Trust's well-pled alter ego arguments as "group pleading" or "horizontal veil piercing."  Courts in this Circuit routinely permit claims to proceed where discovery is needed to clarify the roles of intertwined corporate entities.  Moreover, for liability purposes, the Trust seeks to *vertically* pierce the Corporate Defendants' veils—which is permissible under any law the Court may apply.  This Court should not penalize the Trust for the Moving Defendants' intentional opacity and abuse of the corporate form.

*Fourth*, the FAC states a claim for turnover and violation of the automatic stay.  Section 542(a) requires only that the Trust plead the existence of estate property in the Moving Defendants' possession, custody, or control, and the Moving Defendants do not dispute that the

approximately $27 million held on the Huobi and Poloniex exchanges is exactly that. Similarly, Huobi and Poloniex engaged in affirmative post-petition conduct that violated the automatic stay. Huobi and Poloniex disabled the Debtors' access to their accounts, and Huobi also enacted a process that stripped the Trust's HT tokens of more than 98% of their value. That is not passive retention.

*Fifth*, the Trust states a claim for equitable subordination. Sun's scheme described above is the very sort of inequitable conduct that Section 510(c) exists to remedy: it depleted estate property that would have otherwise been available for distribution, and it did so while Sun and Orange Anthem extracted premiums from customers forced to route through it.

The Motions should be denied in their entirety.

## STATEMENT OF FACTS

### A.    Justin Sun Builds a Cryptocurrency Empire and Acquires Huobi and Poloniex.

Justin Sun is the architect of a sprawling cryptocurrency enterprise that has made him one of the wealthiest and most influential figures in the digital asset industry. In 2017, Sun founded Tron, a blockchain company with an eponymous cryptocurrency. Ex. 1.[1] In October 2019, Sun acquired the Poloniex exchange. FAC ¶ 6. In October 2022, the Huobi exchange announced that its controlling shareholder had sold his interest in Huobi to About Capital, Ex. 2, though it was later revealed through litigation that the controlling interest in Huobi had been sold to both About Capital *and* Digital Legend. Ex. 3 ¶ 3. Although Sun initially sought to conceal his

---

[1] Citations to "Ex." refer to the accompanying Declaration of Jacob M. Croke and the exhibits attached thereto. For purposes of responding to the Moving Defendants' motions to dismiss pursuant to Rule 12(b)(6), the Trust relies on the FAC and the documents that are "integral to or explicitly relied upon in the [FAC]." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). In response to the motions to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), however, the Trust also "point[s] to extrinsic competent evidence" in support of its arguments. *Baker* v. *LivaNova PLC*, 2016 WL 11587245, at *2 (M.D. Pa. Sep. 20, 2016). Although most of the Trust's exhibits merely corroborate the FAC's well-pled allegations, the Trust submits them in opposing a Rule 12(b)(2) motion. *See Time Share Vacation Club* v. *Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984).

role, subsequent reporting disclosed that Sun had spent "$1 billion" to acquire control of Huobi, and that Sun had used About Capital and Digital Legend for this acquisition in an attempt to "[keep] his name out of the deal to avoid scrutiny from China." Ex. 4. "In September 2023, Huobi rebranded to 'HTX,' which stands for "Huobi TRON Exchange, as part of 'a new era for the platform with synergy between HTX, TRON, and Poloniex.'" FAC ¶ 26. HGSA "is the registrant of the 'HTX' trademark in the United States," FAC ¶ 23, and in a recent U.S. court filing has asserted that it is the entity that "owns and operates HTX." Ex. 5 ¶ 2. Sun also has acknowledged that HTX (*i.e.*, Huobi) "is one of [his] own businesses." Ex. 6 ¶ 85.

**B.        Alameda Opens Accounts on the Huobi and Poloniex Exchanges.**

Prior to the Petition Date, Alameda operated accounts on various cryptocurrency exchanges. Alameda opened one such account on the Huobi exchange, and another such account on the Poloniex exchange. FAC ¶¶ 57-58. Both accounts were at all times funded by, controlled by, and used solely for the benefit of, Alameda. *Id.*; *id.* Exs. 1-2.

**C.        As FTX Collapses, Sun Leverages the Crisis.**

As the Debtors fought to contain the escalating bank run that ultimately forced them into the Chapter 11 Cases, Sun exploited their financial distress for his own benefit. On November 8, 2022, Huobi announced to the "TRON and [Huobi] communities" that it had "decided to permanently support users who wish to redeem their Tron tokens . . . deposited on the FTX platform at a 1:1 ratio," including Huobi's HT token. Ex. 7 at 1. Bankman-Fried then caused FTX to announce that it had "reached an agreement with Tron Network Limited to 'establish a special facility to allow holders of [various Sun-controlled tokens] to swap assets from FTX.com 1:1 to external wallets.'" FAC ¶ 75 (quoting Ex. 8). Describing this rescue as the "Tron Ark," Sun tweeted on November 10, 2022, that Huobi's "robust global infrastructure" was on standby for the "modern time crypto voyage for #FTX users to weather the crypto storm." FAC ¶ 77

-4-

(quoting Ex. 9).  As a result, the prices of those tokens on FTX.com spiked by 400% on average.
FAC ¶ 75.  Sun did not, in fact, rescue these customers.

On November 11, 2022, the Debtors commenced the Chapter 11 Cases.
Immediately after, the Debtors determined that the Alameda Huobi Account and Alameda
Poloniex Account held assets then-valued at roughly $22 million and $5.5 million, respectively.
*Id.* ¶¶ 57-58.  The Debtors promptly contacted Huobi and Poloniex, but despite months of
correspondence, both Sun-controlled exchanges refused to return the Debtors' assets.  *Id.* ¶¶ 59-
67.

**Huobi.**  On November 16, 2022, the Debtors contacted Huobi Tech Holdings, Ltd.
*Id.* ¶ 59.  After repeated follow-ups, a legal team member agreed to a call on November 23, 2022,
but he eventually claimed that he did not work at the "correct" Huobi entity, refused to identify
the "correct" entity, and declined to engage further.  *Id.*

The Debtors then wrote to another Huobi entity to request the return of their assets.
*Id.* ¶ 60.  Nearly two weeks later, Huobi's outside counsel requested more information, which the
Debtors, a former Alameda employee, and the U.S. Attorney's Office for the Southern District of
New York provided.  *Id.* ¶¶ 60-62.  The Debtors followed up for several months.  *Id.* ¶¶ 62-63.

On July 21, 2023, the Debtors were *again* redirected:  Huobi's outside counsel
stated that he no longer represented Huobi and directed the Debtors to communicate with unnamed
members of "Huobi's regulatory team."  *Id.* ¶ 63.  On August 16, 2023, however, that new Huobi
team outright refused to comply with any request to transfer the assets, claiming that the Alameda
Huobi Account was "being investigated by the Chinese police."  *Id.*  Despite repeated follow-ups,
Huobi never engaged again.  *Id.* ¶ 64.

**Poloniex.**  On November 16, 2022, the Debtors asked Poloniex to return the assets in the Alameda Poloniex Account.  *Id.* ¶ 65.  The Poloniex "compliance team" requested an "official court order," and the Debtors provided Poloniex with a letter and materials confirming that the Court had authorized the Debtors to secure their at-risk assets and informing Poloniex of the automatic stay.  *Id.* ¶¶ 65-66.  Poloniex agreed to return the assets if the Debtors created a new Poloniex account to facilitate the transfer, which the Debtors did.  *Id.* ¶ 67.  Poloniex then demanded further documentation, all of which the Debtors provided.  *Id.*  Poloniex then went silent for months, before eventually claiming that it was undergoing "internal restructuring."  *Id.*  When the Debtors asked for more information, Poloniex refused—and never responded again.  *Id.*

D.    **Orange Anthem Seeks to Obscure Its Connections.**

Orange Anthem—an entity that has filed a claim for $12 million—is similarly intertwined with Sun, Huobi, and Poloniex.  At the time it was formed, Orange Anthem's sole shareholder and director was Sun.  *Id.* ¶¶ 24, 43.  In April 2022, Sun used Orange Anthem to open an FTX.com account, and indicated in its KYC information that the source of funds was related to Sun's Poloniex exchange.  *Id.* ¶ 43.  Sun appears to have utilized the Orange Anthem account as part of his Tron Ark scheme to artificially inflate the price of Sun-controlled tokens during the Debtors' collapse.  *Id.* ¶¶ 76-78, 81.  The balance of the Tron "liquidity facility" represents "substantially all of the Petition Date balance of the Orange Anthem FTX Account."  *Id.* ¶ 76.

Although the Orange Anthem "proof of claim was nominally filed in [its name] (by Tron personnel), Sun has publicly described himself—personally—as an FTX.com creditor."  *Id.* ¶ 46.  However, except for the Orange Anthem claim, the Trust has identified no claims that are held in the name of Sun or any entity affiliated with him.  *Id.* ¶ 47.

## ARGUMENT

### I.   DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION.

#### A.   Legal Standard.

"It is well established that in deciding a motion to dismiss for lack of [personal] jurisdiction" under Federal Rule of Civil Procedure 12(b)(2), "a court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff." *Toys "R" Us, Inc.* v. *Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003).  The Trust only bears the burden of proof "[o]nce the defense has been raised," such that determination of the motion "requires [the] resolution of factual issues outside the pleadings." *Time Share Vacation Club*, 735 F.2d at 66 n.9. Once raised, the Trust need only make a *prima facie* showing of personal jurisdiction, *Finjan LLC* v. *Trustwave Holdings, Inc.*, 2021 WL 5051147, at *4 (D. Del. Oct. 29, 2021), and here "the relevant forum . . . is the United States in general." *In re FTX Trading Ltd.*, 2023 WL 8814216, at *1 (Bankr. D. Del. Dec. 20, 2023).

Courts must decide whether they have personal jurisdiction before reaching the merits of a claim.  *See Sinochem Int'l Co.* v. *Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007).  This requirement "is inflexible and without exception" because the contrary approach would exceed "the bounds of authorized judicial action and thus offend[] fundamental principles of separation of powers." *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (internal quotation marks omitted).  The Third Circuit has routinely reversed merits dismissals entered while jurisdictional questions remain open.  *See, e.g.*, *In re Lipitor Antitrust Litig.*, 855 F.3d 126, 151 (3d Cir. 2017); *Ellison* v. *Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 204-05 (3d Cir. 2021).

B.     **The Exercise of Personal Jurisdiction Satisfies the Flexible Fifth Amendment Standard.**

The DL Defendants argue they are not subject to personal jurisdiction under the Fourteenth Amendment's "minimum contacts" test.  DL Br. at 7.  However, as this Court is aware—and as the AC Defendants acknowledge (*see* AC Br. at 7-8)—"to determine whether a bankruptcy court's exercise of personal jurisdiction is constitutionally proper, only the requirements of the Fifth Amendment to the U.S. Constitution must be satisfied." *In re Lyondell Chem. Co.*, 543 B.R. 127, 138 (Bankr. S.D.N.Y. 2016).  As the Supreme Court recently held in *Fuld* v. *Palestine Liberation Organization*, the Fifth Amendment "does not incorporate the Fourteenth Amendment minimum contacts standard" and instead "necessarily permits a more flexible jurisdictional inquiry."  606 U.S. 1, 16, 23 (2025); *see also In re Fairfield Sentry Ltd.*, 671 B.R. 5, 19-20 (Bankr. S.D.N.Y. 2025).

1.  **The Exercise of Personal Jurisdiction Is Reasonable.**

The District of Delaware has recognized that "*Fuld* cast doubt on the idea that the Fifth Amendment imposes territorial limits on personal jurisdiction without definitively rejecting it," and that "[a]s an original matter, the Fifth Amendment's Due Process Clause did not limit Congress's ability to authorize federal courts to exercise personal jurisdiction over defendants [abroad]." *King* v. *Bon Charge*, 823 F. Supp. 3d 508, 524 (D. Del. 2025) (Bibas, J.).[2]  But even if the Fifth Amendment does impose limits on personal jurisdiction, *Fuld* suggests that a mere "reasonableness" showing is sufficient, as evaluated based on three factors:  "the burden on the defendant, the interests of the forum [], and the plaintiff's interest in obtaining relief."  606 U.S.

---

[2] The DL Defendants insist without authority that, even after *Fuld*, a plaintiff still must "plead meaningful, suit-related U.S. contacts by foreign defendants."  *See* DL Br. at 19 n.7.  But neither the Fifth Amendment nor *Fuld* contains such a requirement.  *See Deutsche Telekom, A.G.* v. *Republic of India*, 155 F.4th 694, 700 (D.C. Cir. 2025).

at 23-24.[3]   Even in the less flexible Fourteenth Amendment context, the "heavy" burden to demonstrate unreasonableness belongs to the defendants.  *Grand Ent. Grp., Ltd.* v. *Star Media Sales, Inc.*, 988 F.2d 476, 483 (3d Cir. 1993).  Here, the AC Defendants, "[h]aving failed to make this argument in [their] opening brief," have waived the defense.  *See Williams* v. *Netflix, Inc.*, 2023 WL 3478568, at *2 (D. Del. May 16, 2023).  Similarly, the DL Defendants have failed to identify any factor other than the purported burden they face in litigating.  DL Br. at 19.  This "passing reference to [the] issue" is insufficient to preserve it.  *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*, 751 F.3d 150, 157 (3d Cir. 2014).

Regardless, all three factors favor the Trust.  *First,* this Court's exercise of jurisdiction would not impose a substantial burden on any of the Jurisdictional Defendants, all of whom are represented by sophisticated U.S. counsel and have actively litigated here.  *In re UD Dissolution Corp.*, 629 B.R. 11, 28 (Bankr. D. Del. 2021).  And this burden is even lower for HGSA, which "is the registrant of the 'HTX' trademark in the United States."  FAC ¶ 23.  *See Jekyll Island-State Park Auth.* v. *Polygroup Macau Ltd.*, 140 F.4th 1304, 1319 (11th Cir. 2025) ("[M]aking the deliberate decision to register a trademark shows an intent to capitalize on the benefits and protections that trademark registration in this country affords.").  *Second*, "[t]he United States has a strong interest in adjudicating claims that arise under its Bankruptcy Code so that both creditors and debtors can obtain the remedies and relief that the United States Congress has determined are fair and equitable."  *In re Firestar Diamond, Inc.*, 654 B.R. 836, 903 (Bankr. S.D.N.Y. 2023).  *Third*, the Trust "ha[s] an interest, as a matter of judicial efficiency, in resolving disputes related to the Chapter 11 petition in this forum."  *In re Bozel S.A.*, 434 B.R. 86, 101

---

[3] The Jurisdictional Defendants wrongly argue that the reasonableness inquiry is "similar" to the minimum contacts test.  *See* AC Br. at 9; DL Br. at 19 n.7.  *Fuld* makes clear that reasonableness is a separate component of the Fourteenth Amendment analysis that applies *in addition to* minimum contacts—not as a proxy for it.  *See* 606 U.S. at 24.

(Bankr. S.D.N.Y. 2010). Because all three factors favor the Trust, the Jurisdictional Defendants have failed to show that the exercise of jurisdiction would be unreasonable.

### 2. The Moving Defendants Are Subject to Personal Jurisdiction as the Alter Egos of Orange Anthem.

It is black-letter law that the filing of a proof of claim submits the claimant to personal jurisdiction. *Langenkamp* v. *Culp*, 498 U.S. 42, 44-45 (1990). Orange Anthem concedes that it is subject to jurisdiction on this basis. AC Br. at 12. And as Orange Anthem's alter egos, the Jurisdictional Defendants are likewise subject to the jurisdiction of this Court.

"[F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation when the individual or corporation is an alter ego . . . of a corporation that would be subject to personal jurisdiction in that court." *Radian Guar. Inc.* v. *Bolen*, 18 F. Supp. 3d 635, 648 (E.D. Pa. 2014) (cleaned up). "Because the Court is determining an issue of federal law, *i.e.*, the personal jurisdiction of a federal court," this Court should "first consider federal common law." *In re Kwok*, 2025 WL 1185195, at *6 (Bankr. D. Conn. Apr. 23, 2025); *see also, e.g.*, *Sierra* v. *Trafigura Trading LLC*, 2024 WL 3823018, at *13 (D. Del. Aug. 14, 2024) (noting that "[f]ederal common law regarding the alter ego analysis" would apply to its jurisdictional inquiry); *In re Glob. Cord Blood Corp. Sec. Litig.*, 820 F. Supp. 3d 221, 245 (S.D.N.Y. 2026) (applying federal common law to the alter ego jurisdiction analysis and noting that "[t]he Second Circuit has recently indicated that when a case arises under federal law, the analysis is governed by federal common law").

Jurisdiction may be imputed to Sun as the alter ego of Orange Anthem. And under federal common law, "sister" corporations can be alter egos even without a parent-subsidiary relationship. *See, e.g.*, *In re Maxus Energy Corp.*, 641 B.R. 467, 558 (Bankr. D. Del. 2022) ("Courts have pierced the veil in cases involving 'sibling' corporations, and in cases involving

-10-

even more intricately arranged corporate structures." (quoting *Bhd. of Locomotive Eng'rs* v. *Springfield Terminal Ry. Co.*, 210 F.3d 18, 29 (1st Cir. 2000))); *In re Bowen Transps., Inc.*, 551 F.2d 171, 179 (7th Cir. 1977) ("The separate corporateness of affiliated corporations owned by the same parent may be [] disregarded under the proper circumstances."); *see also Pritzker* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1122 (3d Cir. 1993) (company's "corporate sister" bound by an agreement it did not sign, in part because it "may be an alter-ego of" the corporate sibling that had signed it).   The entities identified in the FAC are subject to Sun's common ownership and control and thus are "sibling" companies, *see* FAC ¶¶ 5, 19-26, and as a result, the jurisdictional acts of each entity may be imputed to the others if their veils are pierced.

Under federal common law, entities' veils may be pierced if the companies are "little more than a legal fiction" and the situation "present[s] an element of injustice or fundamental unfairness." *Trs. of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds* v. *Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003).  In assessing whether a veil may be pierced, courts consider:

> [the] failure to observe corporate formalities, non-payment of dividends, insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant shareholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*In re Blatstein*, 192 F.3d 88, 100 (3d Cir. 1999).  However, these factors are not "elements of a rigid test," and not all must be present. *Lutyk*, 332 F.3d at 194.  Courts may also consider other commonalities, including the "retention of the same law firm," the "present[ation of] the group as a single entity," and the sharing of email domains. *See Pontiaki Special Mar. Enter.* v. *Taleveras Grp.*, 2016 WL 4497058, at *4-5 (D. Del. Aug. 26, 2016).  The Trust must only allege these factors "beyond mere speculation or recitation of the elements," because "[t]he nature and extent of the

-11-

dominion and control exercised by [Sun] . . . is a question of fact, not subject to resolution on a motion to dismiss." *Blair* v. *Infineon Techs. AG*, 720 F. Supp. 2d 462, 473 (D. Del. 2010).

### i.    Sun's Entities Have Failed to Observe Corporate Formalities.

Sun's entities have failed to observe even the most basic corporate formalities. Indeed, Sun's enterprise is operated through "intentionally opaque and non-functional corporate structures." FAC ¶ 28.  These intentionally opaque structures "allow[] for a reasonable inference" that Sun failed to observe corporate formalities. *Pontiaki Special Mar. Enter.*, 2016 WL 4497058, at *4.  For example, as alleged in the FAC:

- "[A] publicly available Huobi service agreement refers to 'HTX Ltd.' as a counterparty to certain Huobi agreements.  Although Huobi identifies HTX Ltd. as being incorporated in the Seychelles, the Trust has been unable to identify any company incorporated under that name in the Seychelles corporate registry." FAC ¶ 28 (discussing Ex. 10 at 1).

- "Other Huobi agreements do not even identify a single extant corporate entity, and instead refer generally to the 'HTX Platform.'  Huobi's primary user agreement highlights the absurdity and intentional opacity of this structure, stating that Huobi is operated by a group of 'HTX Operators' that includes 'all parties that run the Platform, including but not limited to legal persons, ***unincorporated organisations*** and teams that provide the Services and are responsible for such Services' (emphasis added). *Id.* (quoting Ex. 11 at 1).

- That same agreement states "'[i]n case of a dispute, you shall determine the entities by which this Agreement are performed . . . and the counterparties of the dispute.'" *Id.*

- Notwithstanding that Poloniex's website identifies Defendant Polo Digital Assets, Ltd., *see* FAC ¶ 29 (discussing Ex. 12 at 1), the Seychelles corporate registry indicates that Polo Digital Assets, Ltd. has been dissolved and stricken off. *Id.*

Moreover, Sun's own conduct demonstrates that he treats Huobi and Poloniex not as independent corporate entities with separate management and governance, but as enterprises he personally owns, controls, and operates.  Sun has repeatedly announced platform policies, financial decisions, and operational changes for Huobi and Poloniex in his personal capacity, including via public statements and social media, without reference to boards, officers, or independent corporate authorization.  *See* Exs. 13-15.  Such conduct reflects a breakdown of formal governance barriers,

the absence of meaningful separation between ownership and management, and use of corporate forms as instrumentalities rather than independent enterprises.  Courts have repeatedly held that when an individual publicly exercises operational control, announces policy decisions on an entity's behalf, and holds himself out as the decisionmaker, such conduct evidences domination and a failure to respect corporate separateness.  *See Compagnie des Grands Hôtels d'Afrique S.A.* v. *Starwood Cap. Grp. Glob. I LLC*, 2019 WL 148454, at *4 (D. Del. Jan. 9, 2019) ("This failure to maintain formal barriers between management is enough to plead that [defendant] failed to observe corporate formalities."); *see also Bd. of Trs. of Teamsters Loc. 863 Pension Fund* v. *Foodtown, Inc.*, 296 F.3d 164, 172 (3d Cir. 2002).  Sun's conduct satisfies this standard:

- "Sun 'has effectively functioned as [Huobi]'s leader,' including by exercising day-to-day control and setting corporate strategy.  Similarly, comments by former Poloniex employees confirm that Sun entirely controls the policies and procedures of the Poloniex exchange after he acquired it in 2022."  FAC ¶ 30; *see also* Exs. 16, 17.

- "Sun has repeatedly referred to Huobi and Poloniex as 'his' exchanges and their assets as 'his' money."  For example, in response to concerns about Huobi's solvency, Sun wrote, "***Brother Sun will cherish the Huobi brand like his own child (after all, it cost over a billion dollars, needs to keep making money, and tarnishing [its] reputation would be a huge loss).***"  FAC ¶ 31 (emphasis in original); *see also* Ex. 18.  Sun also wrote, "***Some people say they want to withdraw coins to drain Brother Sun's money, Brother Sun doesn't want that, but he's absolutely not afraid of everyone withdrawing coins.***"  *Id.* (emphasis in original).

- "Immediately following [separate November 2023 security incidents affecting Huobi and Poloniex], Sun issued public statements addressing users of Huobi and Poloniex collectively.  In those statements, Sun announced that *both* platforms were suspending deposits and withdrawals and represented that 'we' would bear the losses arising from *all* of the security incidents across *both* exchanges."  *Id.* ¶ 36 (emphasis in original) (discussing Ex. 15).

Sun's failure to observe corporate formalities includes the opening of Defendant Orange Anthem's FTX.com customer account.  Tron personnel opening the account at Sun's direction provided source of wealth documentation referencing assets held in the name of "Black Anthem Ltd.," another shell company where Sun was the sole shareholder and director.  FAC ¶¶ 44, 90.  When FTX personnel noted the discrepancy, the Tron personnel "expressly dismissed

-13-

any distinction among the entities," stating, "'Yes Sun Yuchen is the sole director for Black Anthem Ltd as same as Orange Anthem Ltd,' insisting that Sun's common ownership and control rendered the entities interchangeable." *Id*. ¶ 44. Thus, "personnel operating at Sun's direction argued that FTX should ignore any distinctions between these ostensibly different legal entities" and that "all of the accounts and assets held by Black Anthem and Orange Anthem were functionally interchangeable." *Id.* ¶ 45; *see also* Ex. 19.[4]

Sun has since reaffirmed this very view of his corporate vehicles in a court filing of his own. On April 21, 2026, Sun and two of his shell companies—Black Anthem Ltd. and Blue Anthem Ltd. (referring to themselves as the "Sun Companies")—filed a complaint in which they described HTX (*i.e.*, Huobi) as "one of Mr. Sun's own businesses." *Sun* v. *World Liberty Fin. LLC*, No. 3:26-cv-03360, Dkt. No. 1 ¶ 85 (N.D. Cal. Apr. 21, 2026).[5]

Moreover, multiple governmental and regulatory entities have observed that Sun and his entities routinely fail to observe corporate formalities, further supporting the inference that Sun employs a pattern of inadequate recordkeeping, opaque governance, and disregard for corporate boundaries in operating his businesses:

- "[I]n March 2023, the U.S. [SEC] filed a civil enforcement action alleging that Sun exercised pervasive control over multiple corporate entities—including Tron Foundation Limited, BitTorrent Foundation Ltd., and Rainberry, Inc.—such that those entities functioned as alter egos of Sun himself, rather than as independent actors." FAC ¶ 37 (discussing Ex. 20 ¶ 13).

- "Similarly, in August 2021, after Sun had acquired Poloniex, the SEC instituted a settled enforcement action against Poloniex, LLC, finding that it had operated the Poloniex exchange

---

[4] Rather than accept these well-pled allegations as true, the AC Defendants seek to draw impermissible inferences in *their* favor that the provision of financial information for one of Sun's entities on behalf of another cannot support the conclusion that Sun viewed his "entities [as] interchangeable," and was part of a pattern and practice of "exploit[ing] the fiction of corporate separateness . . . for his own personal benefit," including "in these Chapter 11 Cases." FAC ¶¶ 44, 46; *Mallinckrodt IP Unlimited Co.* v. *B. Braun Med., Inc.*, 2018 WL 2254540, at *1 (D. Del. May 17, 2018).

[5] Of particular note, Sun, Black Anthem Ltd., and Blue Anthem Ltd. are represented in this recently filed action by several of the same lawyers representing Digital Legend and HGSA—but not Sun or Orange Anthem—in this adversary proceeding.

in the United States as an unregistered national securities exchange and failed to comply with basic regulatory obligations." *Id.* ¶ 37 (discussing Ex. 21).

- In October 2025, the FCA filed a claim against HGSA and various "persons unknown" for allegedly promoting cryptoasset services to UK consumers in breach of UK law. Ex. 22. The FCA stated that "[d]espite requests the [Huobi] Exchange have not volunteered their corporate identity," but that it was "to be inferred" that HGSA was "the owner, operator and controller of the [Huobi] Exchange" (potentially alongside other defendants). *Id.* ¶¶ 8, 9.1.

Sun's corporate shell game has continued to capture the attention of regulators, even after the filing of the FAC. In a February 2026 press release, for example, the FCA concluded that Huobi "operates an opaque organisational structure, hiding the identities of its owners and the operators of its website." Ex. 23 at 1. That regulators continue to reach these conclusions even as this litigation unfolds only reinforces the well-pled allegations of the FAC.

### ii.   Sun Uses His Entities as Mere Façades to Advance Personal Interests.

As alleged in the FAC, Sun abuses his personal control over Orange Anthem, Huobi, and Poloniex to advance his own business interests:

- While the Sun-Huobi deal was being negotiated, "Huobi sources communicated to Samuel Bankman-Fried that Huobi's then-Chief Executive Officer, Li Lin, was hesitant to sell Huobi to Sun because he 'does not trust Justin Sun' and thought that 'Justin [would] arbitrage [Huobi] tokens to ruin the [H]uobi platform.'" FAC ¶ 39; *see also* Ex. 24 at 2.

- "After Sun acquired and assumed control over the Poloniex exchange in October of 2019, a former employee recounted that Sun 'started to see all the possibilities of using Polo as more or less his personal bank.'" FAC ¶ 40; *see also* Ex. 17. For example, in a project internally dubbed "Operation Couch Cushions," Sun directed Poloniex engineers to sweep more than $10 million in stranded customer Bitcoin "dust" from the exchange for himself. FAC ¶ 40.

- "As recently as December of 2025, public analyses of Huobi's proof-of-reserves demonstrate that Bitcoin products directly traceable to Sun's Poloniex make up a massive portion of Huobi's reserves—but Poloniex itself has yet to complete a proof-of-reserves, and Poloniex does not anywhere disclose where the Bitcoin backing its product is held, or where this Bitcoin comes from." *Id.* ¶ 41; *see also* Ex. 25.

### iii.     Sun's Entities Maintain Non-Functioning and Overlapping Directors.

"Although much of the information regarding the functioning of the directors exists in the exclusive control of the Defendants, publicly available information indicates that Sun installs non-functioning directors with close personal relationships to him to oversee his entities." FAC ¶ 48. As alleged in the FAC:

- "Sun has installed Yiying Jiang—publicly reported to be Sun's stepmother—as a (or the sole) director of numerous entities he controls, including Defendant Digital Legend. Jiang has served as director or shareholder of more than fifteen of Sun's other entities, including several entities directly connected to other defendants in this action." Among those is Augustech LLC, a Delaware company that employed the U.S-based personnel that operated Poloniex, and which Jiang sought to dissolve *after* this action was commenced. *Id.* ¶ 49; Exs. 17, 26, 27; [Adv. D.I. 32 ¶ 2].

- "Jiang also is a director of several TRON Network entities—for example, she is a director of the Singapore entity 'Tron Foundation Limited,' and was appointed to that position the same day Sun resigned from his role as director of that entity, and also is the sole director of 'Tron Network Ltd.,' a British Virgin Islands entity." FAC ¶ 50; Exs. 28, 29.

- "Jiang also serves as a director of Rainberry, Inc., a California company where Sun is the sole shareholder and Sun's father, Weike Sun, serves as CEO. Jiang's role at more than fifteen of Sun's entities, in connection with her close personal relationship to Sun, suggests that Jiang acts as a director in name only, with little actual function." FAC ¶ 50; Exs. 30, 31.[6]

- "Sun's father, Weike Sun, also serves as the Chairman of the Board of Directors of 'Tron, Inc.' (Nasdaq: TRON), a publicly traded Nevada company that spent 25 years as a manufacturer of plush toys and other amusement park souvenirs operating under the name 'SRM Entertainment, Inc.' before announcing in mid-2025 a 'pivot' to a 'TRON Token Treasury Strategy.' As part of that 'pivot,' an entity nominally 100% owned by Weike Sun invested $100 million in the company, the existing Board was replaced by Weike Sun as Chairman and two other Tron-affiliated individuals, Justin Sun was named as 'Global Advisor,' and the company changed its name to Tron, Inc." FAC ¶ 51; Exs. 32-34.

---

[6] Tellingly, Digital Legend previously supported its motion to dismiss the original complaint with a declaration from Jiang. [Adv. D.I. 32.] After the Trust noted Jiang's close personal ties to Sun and that reliance on her declaration would place her testimony squarely at issue, *see* Dec. 8 Hr'g Tr. 30:22-32:12, the DL Defendants have quietly abandoned her declaration for this round of briefing. The natural inference is that Jiang's testimony would only underscore the FAC's allegations that she is a director in name only.

### iv. Sun's Abuse of the Corporate Form Presents Overall Elements of Fraud, Injustice and Unfairness.

Sun's entities fail to observe corporate formalities and do not maintain adequate corporate records, operating without meaningful governance or compliance controls. "This absence of formal guardrails has facilitated, or at least failed to prevent, criminal activity on Sun's platforms." FAC ¶ 53. Because of compliance failures, "Huobi has been used by scammers to deprive customers of billions of dollars of cryptocurrencies." FAC ¶ 54; Exs. 35, 36. Moreover, Sun has exploited the opaque and shifting structures of his entities to impede efforts to recover assets that belong to the Trust. *See* FAC ¶ 55. By failing to observe corporate formalities, obscuring ownership and control, and operating through a web of alter egos, Sun has made it extraordinarily (and intentionally) difficult to identify the proper entity against which to enforce the Trust's rights. At the same time, Sun invokes those same corporate forms opportunistically by appearing in these proceedings as a creditor through yet another affiliated entity.

And even as he denies these allegations in this action, Sun has simultaneously continued his opportunistic misuse of corporate formalities in other venues—asserting ownership and control of Huobi when it serves his interests, and disclaiming that same relationship when it does not. For example:

- On February 2, 2026, in a forfeiture action pending in the United States District Court for the District of Columbia, an HGSA director declared under penalty of perjury that HGSA "owns and operates HTX" and asserted ownership of funds stolen from HTX. Ex. 5 ¶ 2.

- On May 26, 2026, the UK designated HGSA as a sanctioned entity for violations of Russian sanctions, with the UK's Foreign Secretary alleging that HGSA had "channelled over $1.5 billion back into the Kremlin's hands." Exs. 37, 38. That same day, Huobi (including through a post by Sun) responded by claiming that "Huobi Global S.A. is distinct from the online HTX exchange." Exs. 39, 40.

These about-faces underscore the artificiality of the corporate separateness Sun and his entities invoke, and how Sun's misuse of corporate formalities results in a manifest injustice.

C.      **The Jurisdictional Defendants Also Are Subject to Personal Jurisdiction for the "Effects" of Their Willful Automatic Stay Violation.**

Even if this Court declines to find that the Jurisdictional Defendants are alter egos of Orange Anthem, the Court should still find they are subject to jurisdiction for the "effects" of Huobi's willful violation of the automatic stay (which can likewise be attributed to Sun as Huobi's alter ego). Courts may exercise specific jurisdiction for "intentional conduct . . . calculated to cause injury" in the forum. *Calder* v. *Jones*, 465 U.S. 783, 791 (1984). More specifically, personal jurisdiction exists under the "effects" test when:

> (1) [t]he defendant committed an intentional tort; (2) [t]he plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; [and] (3) [t]he defendant expressly aimed [its] tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

*IMO Indus., Inc.* v. *Kiekert AG*, 155 F.3d 254, 265-66 (3d Cir. 1998). Huobi's willful violation of the automatic stay satisfies all three elements.

*First*, a "[w]illful violation of the automatic stay is an intentional tort." *In re Davis*, 177 B.R. 907, 911 (B.A.P. 9th Cir. 1995); *see also, e.g.*, *In re Parker*, 644 B.R. 805, 837 n.30 (N.D. Cal. 2021), *aff'd*, 2022 WL 15523089 (9th Cir. Oct. 27, 2022). The Jurisdictional Defendants rely on *Sheehan* v. *Breccia Unlimited Co.* to suggest that a violation nevertheless may not confer jurisdiction. *See* AC Br. at 11 (citing 48 F.4th 513, 521-22 (7th Cir. 2022)); DL Br. at 18 (citing 2021 WL 4355363, at *5 (N.D. Ill. Sep. 24, 2021)).[7] But whereas the Irish defendants in *Sheehan* did not "purposefully reach out beyond Ireland and affirmatively affiliate themselves

---

[7] The DL Defendants, citing *Rocke* v. *Pebble Beach Co.*, 541 F. App'x 208, 212 (3d Cir. 2013), also assert that the retention of the Trust's property is a "post-injury contact" that cannot give rise to personal jurisdiction. *See* DL Br. at 18. As an initial matter, *Rocke* expressly notes that courts may consider post-injury contacts. *See* 541 F. App'x at 212. But even if a purely post-injury contact could not establish personal jurisdiction, that principle would be inapplicable here because the retention of estate property and the resulting harm are ongoing. *See Retention*, *Black's Law Dictionary* (12th ed. 2024) (defining "retention" as, *inter alia*, "continued possession, without surrender").

with the United States in their dealings" with estate property, 2021 WL 4355363, at *5, here, Huobi purposefully engaged with the Debtors and affiliated itself with the United States before changing course, hindering management of the estate. *See* FAC ¶¶ 59-64. These bad-faith attempts to impede the Trust's bankruptcy proceedings far exceeded the "few letters" in *Sheehan* that were "nothing more than ministerial actions taken in light of the Irish court's disposition of the litigation in Ireland." 48 F.4th at 526. Moreover, *Sheehan* cannot survive *Fuld*. As explained in an amicus brief to the *Fuld* Court, *Sheehan* is a paradigmatic example of how "appellate courts in the thrall of *International Shoe* have restricted the bankruptcy courts' ability to protect [estate] property from foreign interference" despite Congress's clear intent to "enable[] the bankruptcy court to take jurisdiction of the debtor's property 'wherever located' throughout the world." Brief of Professor Stephen E. Sachs as Amicus Curiae in Support of Petitioners, *Fuld*, 606 U.S. (Nos. 24-20, 24-151), 2025 WL 430939, at *25.

      *Second*, the Trust "felt the brunt of the harm" of this misconduct in the United States. Defendants violated the automatic stay after the Debtors' Chapter 11 filing in this forum, at which point the Debtors' professional activities—namely, their liquidation proceedings overseen by this Court—were centered here. The Jurisdictional Defendants' willful violation of the automatic stay has undermined these activities by inhibiting the "orderly liquidation procedure under which all creditors are treated equally." *In re Adams*, 27 B.R. 582, 583 (D. Del. 1983). Under these circumstances, the Trust has suffered the "brunt of the harm" here.

      *Third*, Huobi's withholding of the Trust's assets was "expressly aimed" here. *IMO Indus., Inc.*, 155 F.3d at 265. If Huobi did not intend to reach the United States when it affirmatively disabled access to the Trust's assets, interacted with the Debtors' U.S.-based representatives in a high-profile U.S. bankruptcy, and then changed course to evade liability, then

it is difficult to imagine which forum Huobi intended to reach.  Courts have found defendants in similar contexts to have "expressly aimed" conduct at the forum.  *See, e.g.*, *Gambone* v. *Lite Rock Drywall*, 288 F. App'x 9, 14 (3d Cir. 2008); *State Farm Mut., Auto. Ins. Co.* v. *Tz'doko V'Chesed of Klausenberg*, 543 F. Supp. 2d 424, 431 (E.D. Pa. 2008).  Because the Defendants "expressly aimed" an intentional tort here and harmed the Trust, this Court has specific jurisdiction.

## II.    IN THE ALTERNATIVE, THE TRUST SHOULD BE GRANTED JURISDICTIONAL DISCOVERY.

If this Court finds the Trust has not met its burden with respect to any Jurisdictional Defendant, the Court should permit jurisdictional discovery.  *See bioMérieux, S.A.* v. *Hologic, Inc.*, 2018 WL 4647483, at *3 (D. Del. Sep. 26, 2018) ("Plaintiffs' request for jurisdictional discovery is ripe only if the Court finds a lack of a prima facie case . . . ."); *Dan Dee Int'l, LLC* v. *Glob. New Ventures Grp. LC*, 2024 WL 3043430, at *7 (D. Del. June 18, 2024) (granting jurisdictional discovery because plaintiffs had "failed to make a prima facie showing" of jurisdiction but had shown "the possible existence of the requisite contacts").  "Where the plaintiff's claim is not clearly frivolous," courts "should ordinarily allow discovery on jurisdiction."  *Compagnie des Bauxites de Guinee* v. *L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir. 1983).  The Trust need only "suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum [].'"  *Eurofins Pharma US Holdings* v. *BioAlliance Pharma SA*, 623 F.3d 147, 157 (3d Cir. 2010).  "Moreover, there is, in some sense at least, a 'presumption' of jurisdictional discovery as to defendants that are corporations."  *Prestan Prods. LLC* v. *Innosonian Am., LLC*, 2024 WL 278985, at *3 (D.N.J. Jan. 25, 2024); *see also Metcalfe* v. *Renaissance Marine, Inc.*, 566 F.3d 324, 336 (3d Cir. 2009) ("[J]urisdictional discovery [is] particularly appropriate where the defendant is a corporation.").

Here, the Trust has (more than) plausibly described both the interrelated nature of the Defendants and several jurisdictional acts. The Jurisdictional Defendants have unique custody and control over additional evidence, including the corporate entities' capitalization and solvency, as well as the relationship between these entities. *See Shuker* v. *Smith & Nephew, PLC*, 885 F.3d 760, 780-82 (3d Cir. 2018) (abuse of discretion to deny jurisdictional discovery to explore an alter ego theory); *Twentieth Century Fox Int'l Corp.* v. *Scriba*, 385 F. App'x 651, 653 (9th Cir. 2010).

Although the Trust maintains that it has established personal jurisdiction over each Defendant, the Trust respectfully requests leave to serve jurisdictional discovery in the alternative.

## III.    THE FAC ADEQUATELY PLEADS CLAIMS FOR TURNOVER, AUTOMATIC STAY VIOLATIONS, DISALLOWANCE, AND EQUITABLE SUBORDINATION.

### A.    Legal Standard.

On a motion pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept well-pled factual allegations as true, construe the FAC in the Trust's favor, and ask only whether the pleading permits a reasonable inference of liability. *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009); *Black* v. *Montgomery Cnty.*, 835 F.3d 358, 364 (3d Cir. 2016). The Court must not resolve disputed facts, weigh competing inferences, or credit Defendants' contrary characterizations. *See In re Student Fin. Corp.*, 335 B.R. 539, 546 (D. Del. 2005). Additionally, documents outside the pleading may only be considered if integral to or explicitly relied on in the FAC. *Schmidt* v. *Skolas*, 770 F.3d 241, 249 (3d Cir. 2014); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426; *Giaccone* v. *Canopius U.S. Ins. Co.*, 133 F. Supp. 3d 668, 672 (D.N.J. 2015).

### B.    The FAC Has Already Survived the Rule 12(b)(6) Standard at the Leave-to-Amend Stage.

The procedural history of this case underscores why dismissal under Rule 12(b)(6) is unwarranted: both Motions relitigate issues briefed in connection with the Trust's Motion for

Leave to Amend.  As the Trust explained there, courts decide whether to grant leave to amend by asking if the amendment would "survive a motion to dismiss."  [Adv. D.I. 65 ¶ 11]; *see also, e.g.*, *Great W. Mining & Min. Co.* v. *Fox Rothschild LLP*, 615 F.3d 159, 175 (3d Cir. 2010) ("The standard for assessing futility is the same standard of legal sufficiency as applies under [Rule] 12(b)(6)." (cleaned up)).

About Capital, Orange Anthem, and Digital Legend all opposed amendment by applying this standard to argue that the FAC failed to state a claim.  *See* [Adv. D.I. 67, at 3-5]; [Adv. D.I. 69, at 3-4].  But after considering "all relevant documents and briefing," the Court granted leave to amend.  [Adv. D.I. 74.]  Now, joined by Sun and HGSA, the Moving Defendants have repackaged the same futility objections under a Rule 12(b)(6) heading.  They do not—and cannot—explain why the result should be different now when the governing standard is identical. The Court should therefore again reject the contention that the FAC fails to state a claim.  *See* *Plumbing Supply, LLC* v. *ExxonMobil Oil Corp.*, 2016 WL 3034385, at *3 (S.D.N.Y. May 27, 2016) ("Amendment is not futile when the amended claim would withstand a motion to dismiss. Accordingly, by allowing this amendment, the Court has decided [the] claim, as amended, states a claim under Rule 12(b)(6)." (citation omitted)); *Del. Display Grp. LLC* v. *Lenovo Grp. Ltd.*, 2016 WL 720977, at *7 (D. Del. Feb. 23, 2016).

C.     **The Moving Defendants' Corporate-Form Arguments Raise Factual Questions That Cannot Defeat Plausibility at This Stage.**

1.     **The Trust Plausibly Pleads Alter Ego Liability.**

Because the DL Defendants apply Delaware alter ego law, *see* DL Br. at 11-15, "such implied consent is sufficient to establish choice of law."  *Marino* v. *Brighton Gardens of Mountainside*, 697 F. Supp. 3d 224, 229 (D.N.J. 2023) (cleaned up).  The AC Defendants, meanwhile, contend English law should apply.  AC Br. at 12-13.  However, especially here, "[a]lter

ego is a highly fact intensive issue," and the Court need not "resolve [it] at the motion to dismiss stage." *Berrios-Bones* v. *Nexidis, LLC*, 2007 WL 3231549, at *9 (D. Utah Oct. 30, 2007); *see also, e.g.*, *Md. Elec. Indus. Health Fund* v. *Masters Elec., Inc.*, 2016 WL 164301, at *4 (D. Md. Jan. 13, 2016) ("[T]he alter ego test is fact intensive, and such analysis is usually inappropriate on a motion to dismiss."); *El Paso Firemen & Policemen's Pension Fund* v. *InnovAge Holding Corp.*, 773 F. Supp. 3d 1236, 1248 (D. Colo. 2025) ("[S]ome courts have declined to resolve alter ego issues even at the summary judgment stage . . . ."). Although this Court has discretion to decide the question, it has recognized that "alter ego liability is a factually intensive inquiry," *In re Maxus Energy Corp.*, 641 B.R. at 556, and the District of Delaware has held that "[u]ltimate factual determinations . . . are not for the court to decide in the context of a motion to dismiss." *Doe v. Sylvester*, 2001 WL 1064810, at *6 (D. Del. Sep. 11, 2001). Similarly, courts within this Circuit have routinely held that a "choice of law analysis in deciding a motion to dismiss is problematic because of the fact-intensive inquiry such an analysis generally requires." *Feingold* v. *State Farm Mut. Auto. Ins. Co.*, 2012 WL 1106653, at *5 (E.D. Pa. Apr. 3, 2012), *aff'd*, 517 F. App'x 87 (3d Cir. 2013); *see also Jenner* v. *Volvo Cars of N. Am. LLC*, 2023 WL 2554697, at *2 (D.N.J. Mar. 17, 2023); *Diaz* v. *FCA US LLC*, 693 F. Supp. 3d 425, 431 n.7 (D. Del. 2023).

However, even if this Court resolves the choice-of-law question, it should look to Delaware law as the forum with the greatest interest. *See UBS Sec. LLC* v. *Dondero*, 2025 WL 928901, at *9 (N.Y. Sup. Ct. Mar. 25, 2025) ("[A]lter ego liability . . . do[es] not implicate the corporation's internal affairs and there is no presumption in favor of . . . the jurisdictions of incorporation.") (quotations omitted); *Highland CDO Opportunity Master Fund, L.P.* v. *Citibank, N.A.*, 270 F. Supp. 3d 716, 725 (S.D.N.Y. 2017). Applying forum law is all the more compelling here where the defendant corporations are incorporated in different countries, and the Court would

need to apply the law of multiple jurisdictions.  *See* DL Br. at 11; AC Br. at 12.  Indeed, courts have applied forum law to an alter-ego analysis where the "determination and application" of forum law is "eas[ier]" to determine and clearer.  *In re Kwok*, 2025 WL 1185195, at *8; *see id.* (declining to apply English alter ego law where the court was "not aware of the full panoply of doctrines English courts may apply" and did not "know how an English court would rule").

Under Delaware law, courts consider factors largely mirroring those under federal law.  *E.g.*, *Harrison* v. *Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 619 (D. Del. 2018); *In re Opus E., L.L.C.*, 480 B.R. 561, 570 (Bankr. D. Del. 2012); *Mason* v. *Network of Wilmington, Inc.*, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005).  As the Trust explained in Section I(B)(2), *supra*, the FAC adequately pleads those factors.  Taken together and accepted as true, these allegations go well beyond common ownership and support the inference that the Corporate Defendants operate to create precisely the unfairness Delaware's alter-ego doctrine exists to remedy.  The Trust is entitled to test its theory, especially given the inquiry's fact-intensive nature.  *See In re Maxus Energy Corp.*, 641 B.R. at 555-56.  To hold otherwise would punish the Trust for failing to plead facts that Defendants deliberately concealed and are in their custody or control.  *See, e.g.*, *McDermott* v. *Clondalkin Grp, Inc.*, 649 F. App'x 263, 267-68 (3d Cir. 2016).

The AC Defendants' arguments fare no better even if the Court applies English law. The AC Defendants invoke *Prest* v. *Petrodel Resources Ltd.* for the proposition that veil piercing is available only where a company is interposed to evade or frustrate an existing obligation.  AC Br. at 13 (citing [2013] UKSC 34 (Ex. A), at 18 ¶ 35).  But that is exactly what the Trust has pled. Alameda maintained its Huobi account before Sun acquired the exchange and interposed his convoluted corporate structure.  *See* FAC ¶¶ 5, 7, 21-23.  After the Petition Date, various Sun-controlled companies invoked Sun's shifting, opaque, and unidentified entities to frustrate estate

obligations.  FAC ¶¶ 59-67, 72-74, 90-91.  That is enough at the pleading stage.  The Trust need not prove now which entity held which title, which entity had operational authority, or how Defendants' internal control structure actually worked.  *See Henderson* v. *Samuel, Son & Co. USA Inc.*, 2025 WL 1681817, at *3 (C.D. Cal. Apr. 24, 2025) ("Defendants cannot continue to evade litigation by hiding behind an enigmatic corporate structure.").  At bottom, the FAC alleges the use of corporate forms not merely to conceal ownership but to impede enforcement of concrete rights that arose before Sun-controlled entities invoked their intentionally opaque structure.

          2.          **Defendants Cannot Defeat the Trust's Well-Pled Alter Ego Theory by Mischaracterizing the Trust's Theory.**

Defendants' "horizontal veil piercing" label misrepresents the Trust's merits theory.  *See* AC Br. at 17, 24; DL Br. at 15.  The Trust does not seek to hold one affiliate liable merely because it shares an owner with another.  Rather, liability flows up to Sun through his shell entities:  Huobi, Poloniex, and Orange Anthem are instrumentalities of Sun, used in a single scheme through which Huobi and Poloniex retain estate property while Orange Anthem seeks a distribution.  Accordingly, the FAC alleges abuse of the corporate form by a common controller. *Cf. Loan Source Inc.* v. *NEWITY LLC*, 2026 WL 796920, at *2 (D. Del. Mar. 23, 2026).

**D.**      **The FAC States a Claim for Turnover.**

Section 542(a) requires any entity with possession, custody, or control of estate property that the trustee may use, sell, or lease to deliver that property, or its value, to the trustee. 11 U.S.C. § 542(a); *In re Am. Home Mortg. Holding*, 458 B.R. 161, 169 (Bankr. D. Del. 2011); *In re Abeinsa Holding, Inc.*, 645 B.R. 680, 689-90 (Bankr. D. Del. 2022).  No Moving Defendants dispute that the assets in the Alameda Accounts are estate property, nor do they argue that the value of the assets is inconsequential.  Indeed, Alameda funded, controlled, and used the Alameda Accounts solely for its own benefit, and those accounts held assets valued collectively in the tens

of millions of dollars as of the Petition Date.  FAC ¶¶ 7-8, 57-58, 69-71, 83, 86.  That is enough to state a claim for turnover.  *See, e.g.*, *In re Am. Home Mortg. Holding*, 458 B.R. at 169.

To evade liability, the Moving Defendants fault the FAC for purported group pleading.  But it is black-letter law that a plaintiff may plead that multiple defendants engaged in the same conduct, and determine through discovery who is responsible—especially where the defendants are intertwined corporations.  *See, e.g.*, *Opheim* v. *Volkswagen Aktiengesellschaft*, 2021 WL 2621689, at *7 (D.N.J. June 25, 2021) (rejecting "group pleading" argument because "the entities [] are intertwined, and more discovery is needed to determine the precise role of each"); *McMahon* v. *Volkswagen Aktiengesellschaft*, 2023 WL 4045156, at *10 (D.N.J. June 16, 2023) ("[W]hen [multiple] entities are intertwined through a complex corporate structure, plaintiffs cannot be expected to know the exact corporate structure and degree of each defendant's involvement at the motion to dismiss stage and prior to discovery." (cleaned up)).  "In fact, some form of group pleading may be necessary in cases involving multiple corporate affiliates whose processes are heavily intermingled."  *Longmeadow One Solar LLC* v. *Trina Solar Co.*, 2025 U.S. Dist. LEXIS 167675, at *11 (D.N.J. Aug. 28, 2025) (cleaned up).  That is particularly true here, where Huobi itself states that it operates through unnamed "legal persons, unincorporated organisations and teams."  FAC ¶ 28; *see also Loosier* v. *Unknown Med. Dr.*, 435 F. App'x 302, 307 (5th Cir. 2010) ("[W]e do not require plaintiffs to plead facts peculiarly within the knowledge of defendants.").  Moreover, as discussed above, the Corporate Defendants function as a unified enterprise under the Trust's alter-ego theory.  *See* Section I(B)(2), *supra*.  They cannot use their own opacity as both a shield against turning over assets and a sword against the Trust's well-pled allegations.  *See Henderson*, 2025 WL 1681817, at *3.[8]

---

[8] Defendants' citations to *In re FBI Wind Down, Inc.*, and *Touch America Holdings, Inc.*, are inapposite, as those cases rejected turnover from an affiliate based solely on parent or shareholder status.  *See* 581 B.R. 116, 131 (Bankr. D. Del.

**E.      The FAC States a Claim for Disallowance.**

Section 502(d) of the Bankruptcy Code provides that the Court "shall disallow" any claim of an entity from which property is recoverable under, among other provisions, Section 542, unless that entity has paid the amount or turned over the property for which it is liable. 11 U.S.C. § 502(d). Section 502(d) is coercive: A claimant shall not share in estate distributions while withholding recoverable property. *See In re KB Toys Inc.*, 736 F.3d 247, 252-53 (3d Cir. 2013).

The FAC states a Section 502(d) claim. Sun-controlled entity Orange Anthem filed a $12 million proof of claim while Sun-controlled entities Huobi and Poloniex are withholding property recoverable under section 542. FAC ¶¶ 27-55, 83-87, 89-92. Sun has described himself as an FTX creditor, yet the Trust has identified no claim tied to Sun other than Orange Anthem's. FAC ¶¶ 46-47, 91. Sun's insistence that the disallowance claim cannot apply to him because he has not filed a proof of claim in his own name misses the point: under the Trust's alter-ego theory, Orange Anthem's claim is Sun's. Sun and Orange Anthem also are incorrect that, because no final turnover judgment has been entered, the Court must dismiss the Trust's disallowance claim. *See* AC Br. at 22-23. This Court already has held in these Chapter 11 cases that a Section 502(d) claim may proceed while the underlying predicate claim remains pending. *See In re FTX Trading Ltd.*, 2024 WL 4562675, at *15 (Bankr. D. Del. Oct. 23, 2024); *see also In re NWL Holdings, Inc.*, 2013 WL 2436667, at *8 (Bankr. D. Del. June 4, 2013).

**F.      The FAC States a Claim for Violation of the Automatic Stay Against Sun, Huobi, and Poloniex.**

Section 362(a)(3) of the Bankruptcy Code stays "any act" to obtain possession of, or exercise control over, property of the estate. Although *City of Chicago* v. *Fulton* held that

---

2018); 401 B.R. 107, 126 (Bankr. D. Del. 2009). The Trust alleges more: operational domination, opaque operators, refusal to identify responsible entities, and misuses of the corporate form to block recovery. FAC ¶¶ 26-55, 59-64.

passive retention does not, by itself, violate section 362(a)(3), *see* 592 U.S. 154, 158-62 (2021), affirmative post-petition conduct that alters the status quo remains squarely actionable. *See In re Thgh Liquidating LLC*, 2020 WL 5409002, at *4 (D. Del. Sep. 9, 2020); *In re Prudential Lines, Inc.*, 928 F.2d 565, 573-74 (2d Cir. 1991). The FAC pleads exactly such conduct against Huobi, Poloniex, and—through the well-pled alter-ego theory—Sun. *See* Section I(B)(2), *supra.*[9]

In response to the FTX collapse and the commencement of these Chapter 11 Cases, Huobi affirmatively disabled access to the Alameda Huobi Account and then refused to return the account's balance. FAC ¶¶ 57, 59-64, 72, 95. That is an affirmative post-petition change in access, not passive retention. *See In re Glenn*, 677 B.R. 871, 879 (Bankr. E.D. Pa. 2026) (post-petition activation of a "[k]ill [s]witch" to disable vehicle violated automatic stay). Separately, Huobi implemented a conversion of HT tokens to HTX tokens that was available only through the Huobi platform, and only for a limited period, stripping HT holders of the token's economic benefits and causing a decline of more than 98 percent in value—all while the Trust was locked out of the platform required to participate. FAC ¶¶ 73, 95. Post-petition conduct that diminishes value—such as Huobi's devaluation of the Trust's tokens—is itself an act to exercise control over estate property. *In re Prudential Lines*, 928 F.2d at 574 (non-debtor could not take a "worthless stock deduction" that "would have the legal effect of diminishing or eliminating property of the bankrupt estate"); *see also In re Klarchek*, 508 B.R. 386, 397 (Bankr. N.D. Ill. 2014); *In re Daya Meds., Inc.*, 560 B.R. 855, 858 (Bankr. S.D. Fla. 2016).

## G. The FAC States a Claim for Equitable Subordination.

A claim may be equitably subordinated under Section 510(c) if there is (i) inequitable conduct by the claimant, (ii) injury to creditors or unfair advantage to the claimant,

---

[9] The Moving Defendants do not dispute that the Trust states an automatic stay claim against Poloniex.

and (iii) consistency with the Bankruptcy Code. *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 411 (3d Cir. 2009).  Whether conduct warrants equitable subordination "is a fact-intensive inquiry which should not necessarily be determined on a motion to dismiss." *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 583 (Bankr. D. Del. 2012).  Regardless, the FAC plausibly alleges each element.

**Inequitable Conduct.**  On the eve of FTX's collapse, when customer withdrawals were otherwise frozen, Sun—through Orange Anthem and other entities—negotiated a "token facility" on FTX.com limited to Sun-affiliated tokens.  FAC ¶¶ 75-76.  Sun then publicly amplified the plan as an exclusive "rescue," causing Sun-linked token prices on FTX.com to spike by approximately 400 percent on average.  *Id*. ¶¶ 75, 77, 79, 81.  That arrangement functioned as a selective exit mechanism, allowing customers holding or willing to purchase Sun-affiliated tokens to withdraw funds by paying substantial premiums while similarly situated accounts remained frozen.  *Id*. ¶¶ 78-81.  Orange Anthem delivered the tokens through its FTX.com account, and those very transfers comprise substantially all of Orange Anthem's Petition Date balance.  *Id*. ¶ 76.  Whether that facility was a legitimate arm's-length liquidity arrangement or an inequitable extraction is a factual question that cannot be resolved on the pleadings.  *See In re Vaso Active Pharms., Inc.*, 2012 WL 4793241, at *20 n.108 (Bankr. D. Del. Oct. 9, 2012).

**Injury to Creditors and Unfair Advantage.**  The FAC also alleges both creditor injury and unfair advantage.  The token facility was designed to enable selective withdrawals of assets that should have remained estate property, reducing the pool available for *pro rata* distribution.  FAC ¶ 80.  Sun and Orange Anthem extracted unfair leverage as gatekeepers of the only withdrawal path and inflated the value of Sun-affiliated tokens in a captive, distressed market.  *Id*. ¶¶ 78-81.  Indeed, victims were forced to convert assets "at substantial premiums in order to

access the withdrawal corridor.*"   Id*. ¶¶ 78-79.   Those are precisely the kinds of improper advantages that equitable subordination is designed to remedy.  *See In re Winstar*, 554 F.3d at 413.

**Consistency with the Bankruptcy Code.**  Subordinating Orange Anthem's claim would advance the Bankruptcy Code's distributional norms.  The Bankruptcy Code favors equal distribution among similarly situated creditors, and equitable subordination vindicates that norm where a claimant has unfairly benefitted through inequitable conduct.  *See id.* at 411-12.

The suggestion that there is no one to subordinate Orange Anthem's claim to because creditors will be repaid in full is wrong.  In addition to general unsecured creditors—who still have not been made whole—the Trust has other creditors to which it owes the same duties.  *See In re FTX Trading Ltd.*, 2025 WL 3008666, at *2 (Bankr. D. Del. Oct. 27, 2025).  Regardless, the inquiry is whether the claim, if allowed on parity, would produce inequality in the distribution scheme—not whether some other creditor must end up with less.  *Citicorp Venture Cap., Ltd.* v. *Comm' of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233 (3d Cir. 2003).

Similarly, Sun does not need to be an insider.  Sun's conduct does not reflect arm's-length bargaining; rather, it reflects the manipulation of a distressed market and the creation of an exit corridor that favored Sun-linked tokens over the broader creditor body.  *Compare In re Zohar III*, 639 B.R. 73, 97, 113-14 (Bankr. D. Del. 2022) (insider relying on ordinary contractual rights), *with* FAC ¶¶ 75-81 (pleading selective manipulation).  Moreover, Sun is incorrect that he has no claim to subordinate:  the Trust's alter-ego theory ties Sun directly to Orange Anthem's claim.  FAC ¶¶ 27, 89, 99-100.

## CONCLUSION

For all of the foregoing reasons, the Court should deny the Motions.

-30-

Dated: July 14, 2026
　　　　 Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Howard W. Robertson, IV*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson, IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
　　　　 cobb@lrclaw.com
　　　　 mcguire@lrclaw.com
　　　　 robertson@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Brian D. Glueckstein (admitted *pro hac vice*)
Justin J. DeCamp (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
Daniel P. O'Hara (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: gluecksteinb@sullcrom.com
　　　　 decampj@sullcrom.com
　　　　 dunnec@sullcrom.com
　　　　 crokej@sullcrom.com
　　　　 oharad@sullcrom.com

*Counsel for the FTX Recovery Trust*